UNITED STATES v. ONE NORTH AMERI-
CAN AIRPLANE et al.

No. 10568.

United States Court of Appeals
Third Circuit.

Argued Jan. 25, 1952.

Filed June 18, 1952.

Patrick F. Cooney, Washington, D. C.
(Holmes Baldridge, Asst. Atty. Gen., Gro-
ver C. Richman, Jr., U. S. Atty., Camden,
N. J., J. Frank Staley, Special Asst. to the
Atty. Gen., Roger M. Yancey, Asst. U. S.
Atty., Newark, on the brief), for appellant.

Harold M. Kain, Newark, N. J. (Stickel
& Stickel, Terrell J. Murrell, Newark, N.
J., George R. Sommer, Newark, N. J., on
the brief), for claimant respondent.

Before KALODNER and STALEY,
Circuit Judges, and STEWART, District
Judge.

STEWART, District Judge.

This appeal is from a judgment of the
District Court ordering the return to claim-

ant of an airplane, type B-25J, which the United States seized and attempted to forfeit for violation of the export control laws and regulations. The forfeiture is sought under Title VI of the Espionage Act of June 15, 1917, 22 U.S.C.A. §§ 401–407, on the ground that the claimant had undertaken to export the plane upon an invalid exemption from the requirement of an export license, in violation of the munitions control provisions of the Neutrality Act of 1939, 22 U.S.C.A. § 452, and regulations promulgated pursuant thereto, 22 C. F. R., 1950 Supp., §§ 201.34 and 201.35.

The case was tried by the court below upon the libel of information and answer of the claimant, Terrell J. Murrell, without a jury. At the conclusion of the testimony, the court held that the Government had not proved by the preponderance of the evidence that the claimant had attempted to export the airplane in violation of the munitions control provisions of the Neutrality Act, dismissed the libel and after considering and denying a motion for rehearing, directed the return of the airplane to the claimant. The United States filed its appeal on July 24, 1951. A stay of execution of the order of restoration pending disposition of the appeal has been granted. On August 18, 1951, the trial court filed findings of fact and conclusions of law.

The pertinent facts as found by the Court below are in substance as follows: Terrell J. Murrell, the claimant purchased the airplane which is the subject of this action on December 10, 1948, and on the next day transferred title to Lawrence LaBeulla without consideration. LaBeulla was not the bona fide owner of the airplane but was paid by Murrell to hold title. On December 27, 1948 LaBeulla executed an affidavit in support of a claim for exemption from the requirement of an export license in which he represented that he was the owner of the plane and that the purpose of the contemplated temporary sojourn abroad was to have the aircraft converted for civilian use. The ex-

emption was granted on December 27, 1948, and on the same day the plane took off from the Newark airport on the first leg of the flight to Europe, namely, Montreal, Canada. It was forced down at Albany, New York, by inclement weather, and on December 28, 1948 the customs officials there refused to clear the plane for travel outside the United States and it was returned to Newark. On arrival at Newark on December 28, 1948, LaBeulla executed a second affidavit in support of the claim for exemption, identical with the affidavit of December 27, 1948, except that the purpose of the temporary sojourn abroad was this time stated to be "personal business and pleasure visit Eastern Europe", whereas in the first affidavit the purpose was stated as "have aircraft coverted per CAA specifications in S. E. C. A. Paris or Ferens, Milan, Italy". Clearance was again granted but prior to take-off was withdrawn and subsequently the plane was flown to Teterboro Airport in Bergen County, New Jersey, where it was seized by customs officials on January 12, 1949. After the seizure, the United States timely filed its libel of information, and Murrell filed claim to the aircraft and an answer to the libel.

Two questions require determination by us. First, whether the series of events leading up to the attempts to export the plane constituted a violation of the law [1] (Neutrality Act of 1939), and, second, if the law was violated by the claimant, whether, under the circumstances, seizure and forfeiture of the plane are justified. The trial judge apparently determined that the Neutrality Law as implemented by the regulations was not violated because the Government had failed to establish that it was the intent of the claimant to dispose of the plane abroad (Appendix to Appellant's Brief, p. 68a), and for this reason never considered the question of the propriety of the seizure and forfeiture of the plane.

■ In order to regulate the exportation of arms, ammunition, and implements

---

1. No reported case determines the effect of a false affidavit in support of a claim for exemption in this regard.

of war during periods of national emergency, Congress passed the Neutrality Act of 1939, 22 U.S.C.A. § 441 et seq., which among other things, established a Munitions Control Board. Section 12(a) of the Act, as amended, 22 U.S.C.A. § 452 (a), provides that the National Munitions Control Board

"shall consist of the Secretary of State, who shall be chairman and executive officer of the Board, the Secretary of the Treasury, the Secretary of the Army, the Secretary of the Navy, and the Secretary of Commerce. Except as otherwise provided in this section, or by other law, the administration of this section is vested in the Secretary of State. The Secretary of State shall promulgate such rules and regulations with regard to the enforcement of this section as he may deem necessary to carry out its provisions. The Board shall be convened by the chairman and shall hold at least one meeting a year."

Section 12(d) of the Act, as amended, provides that

"It shall be unlawful for any person to export, or attempt to export, from the United States to any other state, any arms, ammunition or implements of war listed in a proclamation referred to in or issued under the authority of subsection (i) of this section, or to import, or attempt to import, to the United States from any other state, any of the arms, ammunition, or implements of war listed in any such proclamation, without first having submitted to the Secretary of State the name of the purchaser and the terms of sale and having obtained a license therefor."

Under section 12(i) of the Neutrality Act of 1939, the President of the United States is authorized "to proclaim * * * from time to time a list of articles which shall be considered arms, ammunition, and implements of war for the purposes of this section; * * *". Presidential Proclamation No. 2776 of March 26, 1948, 13 F.R. 1623, 62 Stat. 1495, 22 U.S.C.A. § 452 note, enumerated the arms, ammunition, and implements of war under authority of Section 12(i) and included therein the category of aircraft.

Pursuant to Section 12(a) of the Act, the Secretary of State promulgated various rules and regulations with regard to the enforcement of the munitions control provisions of the Neutrality Act of 1939.[2] Section 201.34 in effect exempts flights

2. The regulations that are pertinent here, as codified in Title 22 of the Code of Federal Regulations (Cumulative Supplement) provide, in part, as follows:

"§ 201.34. *Aircraft flown or shipped from the United States for a temporary sojourn abroad.* Aircraft flown or shipped from the United States for a temporary sojourn abroad, of not to exceed 6 months' duration, will not be considered as exported within the meaning of section 12 of the joint resolution when it is the intention of their owners that they shall remain under United States registry and shall be operated by a United States licensed pilot (except in demonstration flights during the entire period of their sojourn abroad and when, further, there is no intention on the part of their owners to dispose of them or of any of their essential parts listed in the President's Proclamation 2549 of April 9, 1942, in any foreign country. * * *".

"§ 201.35 *Customs clearance for aircraft.* Aircraft flown or shipped for temporary sojourn under the provisions of § 201.34 shall not be so flown or shipped until customs clearance has been obtained. Evidence in support of claim for exemption from the requirement of an import or export license should be submitted to the appropriate collector of customs. * * * Aircraft flown out of the United States should be cleared through the customs authorities at the customs port of entry nearest to the place of departure, or at the airport of departure if such airport has been designated as an airport of entry. Before an aircraft of United States registry leaves the United States for a temporary sojourn abroad the customs authorities at the port of exit through which the aircraft is cleared should be informed of the approximate date of return of the aircraft and the port of entry through which it is proposed to return the aircraft to the United States. Persons planning to make flights outside the United States are advised moreover, to communicate with the Civil Aeronautics Board with regard to its requirements."

that fall under the category there described from the requirements of an export license, but it does not exempt such flights from all control under the Neutrality Act, as is evidenced by Section 201.35. That provision, i. e. Section 201.35, places the control in the hands of customs officials and provides that an airplane shall not be flown on a temporary sojourn until customs clearance has been obtained, and that evidence in support of a claim for exemption from the requirements of an export license shall be submitted to the appropriate collector of customs. On November 1, 1948, the Department of State issued Munitions Division Bulletin No. 5 [3] which prescribed a procedure for the handling of claims for exemption from the requirement of an export license.

█ The procedure referred to in this bulletin was adopted by the customs officials in Newark, New Jersey, and the affidavits introduced in this case were ones similar to the affidavit attached to and recommended by Bulletin No. 5. Nothing in the regulations or in the Neutrality Act of 1939 or in the Espionage Act of 1917 expressly makes the filing of a false affidavit a violation of law. There may be doubt that the affidavit requirement is actually a regulation in view of the fact that it is in form a suggested procedure to the various customs officials. Regardless of whether the bulletin actually constituted or was equivalent to a regulation, we consider an attempt to export an airplane, without an export license, but under an exemption from that requirement based upon a false affidavit, a violation of law in the sense used in Section 1 of the Espionage Act. We do not hold, as urged by the Government, that the mere submission of a false affidavit in support of a claim for exemption is such a violation when nothing further exists. The effect of the submission of a false affidavit in support of a claim for exemption is to nullify the exemption if granted in reliance thereon and a subsequent attempt to export the airplane without an export license is in violation of law. Any other conclusion would render the operation of the Munitions Control provisions of the Neutrality Act completely ineffectual. It follows that the Government sufficiently established a violation of the law (Neutrality Act of 1939) and the holding of the court below to the contrary was incorrect.

The remaining question is whether, under the circumstances, seizure and forfeiture of the airplane are proper. Section 1 of the Espionage Act provides for seizure of arms or munitions of war about to be exported, in violation of law, and for the forfeiture of such articles "If upon due inquiry * * * the property seized shall appear to have been about to be so unlawfully exported * * *".

The violation of the Neutrality Act of 1939 and the regulations promulgated thereunder constituted a violation of law which made the airplane subject to seizure and forfeiture.[4] However, Section 1 of the Espionage Act provides for seizure only

3. "In an effort to reduce to a minimum the circumvention of export control laws it is necessary to require of certain aircraft operators departing from the U. S. on temporary sojourns abroad, the submission at the time of customs clearance, *evidence of a reliable nature* that such operators are exempt from the export licensing requirements of the Department of State.

"Accordingly, it is requested that Collectors of Customs adopt the following procedure:

"(1) That operators of U. S. transport aircraft of 10,000 lbs. gross take-off weight or over, holding CAB Letter of Registration issued to noncertified irregular air carriers, or noncarrier operators (private use, commuters, etc.) of military, tactical, executive or transport types of aircraft shall submit: (a) an affidavit containing the information indicated in Exhibit 'A' to this Bulletin, or, (b) a written opinion by the Department of State to the effect that the departure from the United States of the aircraft in question does not constitute an export and, therefore, is exempt from the licensing requirements."

4. See U. S. v. One 1940 Dodge Truck, 5 Cir., 1947, 165 F.2d 211, where it was held that a truck was subject to forfeiture under Section 1 of Title VI of the Espionage Act where the truck when apprehended was at the international boundary between United States and Mexico departing for Mexico without an export license authorizing such departure.

when the article is "about to be exported". Had the airplane been seized on December 27, 28 or 29, 1948, the authority to do so would be clear since it it evident that the airplane was "about to be exported" on those days. The effect of the use of the present tense in Section 1 has been considered by the Court of Appeals for the Fourth Circuit in U. S. v. 21 Pounds, 8 Ounces of Platinum, 1945, 147 F.2d 78, by the Court of Appeals for the Fifth Circuit in United States v. Moreno, 1950, 182 F.2d 258, and by the District Court for the Southern District of New York in United States v. 200 Watches, 1946, 66 F.Supp. 228.

In U. S. v. 21 Pounds, 8 Ounces of Platinum, supra, the Court construed the statute to cover a seizure of property by agents of the United States designated to so act in Section 1, made almost ten months after the attempt to export, where, at the time of the seizure, the goods were in the custody of officers of the law, not so designated, who had previously taken custody of the goods in order to frustrate an existing intent or attempt to export them illegally. Agents of the Federal Bureau of Investigation had seized the platinum as evidence of a violation of the Export Control Law of 1940, as amended, 54 Stat. 714, 50 U.S.C.A.Appendix, § 701, when it was about to be exported and had retained custody until the Collector of Customs at Baltimore seized it under Section 1 of the Espionage Act. In construing this section, the Court held that the status of the goods as of the time of the seizure by the undesignated officers remained unchanged, and so long as the goods remained in their custody, they were subject to seizure for condemnation. We think that, in effect, this is a recognition of the principle that, in order to sustain a seizure and forfeiture of goods under Section 1, it must be shown that the goods were about to be exported when seized. The subsequent seizure was made retroactive where other government agents had seized the goods at a time when they were about to be exported. This fact does not exist in the present case.

In U. S. v. Moreno, supra, the Court of Appeals for the Fifth Circuit held that the language of Section 1 authorizes seizure and forfeiture only when the exportation is presently imminent. Under the facts of that case, an automobile with a new truck tire and tube mounted thereon was seized when an attempt was made to drive across the border between the United States and Mexico at Laredo, Texas. The law then in effect prohibited the exportation of automobile tires and tubes without a special export license, and the claimant Moreno had been issued no such license. Under questioning, Moreno admitted that he had 22 additional new tires and tubes located at his home in Laredo, Texas. These tires and tubes were seized also, and proceedings for forfeiture under Section 1 were instituted. The case was heard by the trial court without a jury, and the trial judge entered final judgment forfeiting the automobile with the new tire mounted thereon but found, as a fact, that the 22 tires and tubes were not about to be exported, and entered an order restoring those tires and tubes to the claimant. From this order, the Government appealed; and on appeal, the trial judge's order was affirmed. In doing so, the appellate court recognized the proposition that the statute authorizes seizure only when the exportation is presently imminent and held that it was a question of fact as to whether the 22 tires and tubes were about to be exported.

The question before the District Court in United States v. 200 Watches, supra, was whether Section 1 of the Espionage Act authorized seizure of property which had been taken out of this country illegally for purposes of sale at a time when it was being returned to this country after the intent to sell had been frustrated. In holding that it did not, the court concluded that Section 1 authorizes seizure only when there is a present attempt to export and the owner is caught in the act of exporting them. Further, the court states that goods do not become tainted once an attempt at illegal export has been made so as to subject them to seizure at a later date wherever and whenever they become within reach of the customs authorities.

All of these courts recognize the principle that Section 1 is no broader in

640

scope than its language would indicate and that it authorizes seizure and forfeiture only when the goods are "about to be exported" although the Fourth Circuit modified it somewhat by making a subsequent seizure by designated agents retroactive to the time of the initial seizure by other officers of the law not designated in Section 1. We conclude that the language of Section 1 leaves us no other alternative than to hold that it is restricted to cases where the goods are "about to be exported". It seems to us that Section 1 contemplates that whenever probable cause to believe that any arms or munitions of war are about to be exported in violation of law exists, seizure should be made and any investigation necessary to support that belief should follow in due course.

In this case, the last attempt to fly the airplane abroad was made at the Newark Airport on December 29, 1948. It does not appear in the record whether any effort was made to seize the airplane prior to January 12, 1949. However claimant, Murrell, testified that the plane was held at the Newark Airport for several days. The nature of this detention and the facts surrounding the transfer of the airplane to the Teterboro Airport are not clear from the record before us. It does appear that LaBeulla transferred the title to Murrell on January 4, 1949. There is also evidence in the record, although there is no finding of fact by the court, to the effect that Murrell had abandoned his intention to have the airplane flown to Europe and that the airplane was not about to be exported on January 12, 1949. There is testimony by Murrell that prior to January 12, 1949, and subsequent to December 29, 1948, he discharged the crew and made some attempts to dispose of the plane in this country.

 Regardless of these statements by claimant, it is possible that exportation of the airplane was imminent on January 12, 1949. However, it is a question of fact for the determination of the trial court and we will, therefore, remand the case for further proceedings in this regard. Since the entire transcript of the prior proceedings is not now before us, we cannot say whether there is sufficient testimony from which these findings might be made. Perhaps, further hearing will be necessary.

Accordingly, the judgment of the District Court will be reversed and the cause remanded for further proceedings consistent with this opinion.