**UNITED STATES v. MORENO et al.**

**No. 13012.**

United States Court of Appeals
Fifth Circuit.

April 28, 1950.

Rehearing Denied May 30, 1950.

William R. Eckhardt, III, Assistant U. S. Attorney, Houston, Texas, Brian S. Odem, U. S. Attorney, Houston, Texas, for appellant.

Horace C. Hall, Laredo, Texas, for appellee.

Before HUTCHESON, Chief Judge, and McCORD and WALLER, Circuit Judges.

McCORD, Circuit Judge.

This is an appeal by the United States from a judgment ordering restored to claimant, Rafael Moreno, 22 tires and 22 tubes which the Government seeks to forfeit under the Export Control laws. Title 22 U.S.C.A. § 401.

The question presented is whether, at the time of their seizure, the tires and tubes were about to be unlawfully exported from the United States in such manner as to be subject to forfeiture under the statute.

On the morning of June 7, 1946, information was received by the United States Customs Service that an attempt would be made to export a new truck tire and tube out of the United States into Mexico by driving the tire and tube across the International Bridge at Laredo, Texas, on the left front wheel of an old Buick automobile. Later the same day Claimant, Rafael Moreno, arrived at the bridge driving the automobile in question. Upon examining the car the Customs Inspector found a new truck tire mounted on the left front rim, and the automobile was seized. This action was justified because the law then in effect prohibited the exportation of automobile tires and tubes without a special export license, and the claimant had been issued no such license to export new tires and tubes into Mexico. Such attempted exportation, therefore, was in violation of law, and the customs inspector acted upon probable cause in seizing the automobile as the vehicle used to effect the unlawful exportation.

When the Claimant was questioned it was learned that there were 22 additional new tires and tubes located at his home in Laredo, Texas, which were owned by a man named Rodriguez. Moreno admitted that originally he had stored 50 tires and tubes at his home, but had disposed of the others for the owner in Mexico. Acting upon this information, the Customs Agents went to the home of the Claimant and seized the tires and tubes as about to be exported from the United States contrary to law.

On August 16, 1949, the district court entered final judgment forfeiting the automobile and the new tire mounted thereon to the United States, but restoring the 22 tires and tubes under seizure to the Claimant.

The sole ground for forfeiture of the property in question is contained in Section 401, Title 22 U.S.C.A., which provides that forfeiture shall result if the property seized "shall appear to have been about to be so unlawfully exported, shipped from, or taken out of the United States". In construing this statute, in the case of One Plymouth Automobile v. United States, 5 Cir., 165 F.2d 186, 188, this court held that the intention to unlawfully export may extend for months or years into the future, but that "the words of the statute authorize seizure only when the exportation is presently imminent". See also, Rimmer v. United States, 5 Cir., 172 F.2d 954, 960.

Here, as in the One Plymouth Automobile case, "no one at the time of seizure was moving or attempting to move these tires." Although the trial court found that claimant intended to export the remaining tires and tubes, under the statute mere intention alone is not conclusive. One Plymouth Automobile v. United States, 5 Cir., 165 F.2d 186, 188.

The trial court sat without a jury, and being the sole trier of the facts, was entitled to believe or disbelieve all or any part of the testimony of the witnesses, and to decide the proper weight to be given the testimony of each witness in every particular. Under the circumstances here involved, we conclude it was justified in finding that the tires and tubes in question were not "about to be [unlawfully] exported", within the meaning of the statute. U. S. v. 200 Watches, 2 Cir., 66 F.Supp. 228, 231.

The judgment is

Affirmed.

HUTCHESON, Chief Judge (dissenting).

If the decision below and our decision affirming it could be limited in their effects to the disposition of the particular tires in this particular case, I should content myself with merely noting my dissent.

Because, however, the decision below and our decision will be cited and followed as a precedent, with the greatly disturbing result of practically nullifying effective enforcement of the export controls at the very important Laredo gateway, I am constrained to give my reasons for dissenting.

These are that when the officers made the seizure, they were in possession of undisputed facts showing beyond any doubt that the tires were not only about to be, they were being, transported daily, in violation of the law. There is first the undenied statement of claimant's wife [1] made to the bridge officer before the car was seized. Second there is the undenied testimony (claimant offered no testimony), that after first denying that he was exporting any merchandise to Mexico, claimant later told the officers that the seized tires not only were about to be, but were actually being exported to, and sold in, Mexico by him for the owner, claimant receiving for his services a commission of five percent.[2]

Upon these facts a finding that the tires

1. Q: "What happened when you answered the phone?"
   A: "Well, it was a lady on the line, and she said that there was a man driving a blue Buick coupe that was heading toward the bridge, and that this man had a brand new truck tire on the front left wheel, and that the license on this car, this Buick car, did not belong to the Buick; it belonged to a Ford, a 1936 Ford."
   Q: "Did she give you the license number?"
   A: "Yes, sir."
   Q: "What happened then, Mr. Dabdoub?"
   A: "Well, I asked her what color the car was, and she said blue, and I asked her if this man had been crossing tires over this way, and she said yes, and that he was crossing over two truck tires a day, and using that same license."
   Mr. Hall: "If the Court please, I am not going to object to this, but it is all hearsay, and it was from the man's wife, and I would like for the Court to take that into consideration."
   The Court: "Yes, sir."

2. A: "At that time I questioned Mr. Moreno as to the ownership of the tires, and he stated these tires were his. I asked him how many more he had of those tires, and he said he had twenty-some-odd more, and later on it developed to be twenty-two. He wasn't sure."
   Q: "Did you talk to him at the station before you found out about the tires, the other tires?"
   A: "Yes, sir."
   Q: "Is that how you found out about the other tires?"
   A: "That is how I found out about the other tires."

Q: "What did he tell you at the time you first questioned him?"
A: "He told me that he had tried to have a customs man by the name of Phelps to get him an export paper, but Mr. Phelps had never gotten an export, and I asked him how many tires had he originally had, and he said fifty, but he didn't have them now. He had disposed of the others."
Q: "Did he say how he had disposed of the others?"
A: "He said he sold them in Mexico."
Mr. Hall: "I didn't understand what you said. Did you say 'into Mexico'?"
A: "He said he had sold them in Mexico."
Mr. Hall: "Did you say 'into' or 'in'?"
A: "He said he had sold them in Mexico."
Mr. Hall: "In Mexico?"
A: "Yes, sir."
Q: (By Mr. Eckhardt) "Now, did you go over with him to where these other tires were stored?"
A: "Yes, sir."
Q: "Now, what did he tell you at that time with regard to the ownership of these tires?"
A: "That is when he told me they belonged to Rodriguez."
Q: "Did you ask him what connection he had with the tires?"
A: "I did."
Q: "What did he tell you?"
A: "He told me he sold those tires, and he got a commission and I pinned him down, and eventually he used the term 'ten per cent'."
"Q: "Did he tell you where he was to sell them?"
A: "In Mexico."

"appeared about to be so unlawfully exported, etc." was demanded.

With deference, nothing in the Plymouth case, nothing in Rimmer's case, cited by the majority, either held or said is to the contrary. Those cases did not hold, they could not, with fidelity to the statute or to common sense, have held that a seizure cannot be made under it except of goods which intending violators are in the act of moving, or attempting to move. Such a dry bones construction would emasculate the statute and turn the stern duty of enforcement of the export law into a football game, in which the play can not start until the ball is in motion, and must stop with the stopping of its motion, or a game of tag, where pursuit begins only when some one starts running and stop with the cry of "Kings Ex," or the crossing of fingers.

The Statute[3] says nothing about either goods or men in motion. It was intended to, it does, reach all goods intended for export when they are about to be exported, that is, when they are either moving toward or gathered at or near the border, as these were, to be smuggled over by the shrewd method, adopted to avoid detection, of carrying over a few each day.

Under the law, as laid down by the majority, in order to seize and forfeit these tires, though the officers knew they were being assembled for export, to be exported day by day, and where the place of assembly and sortie was, they could not seize them and prevent their export. They must be restricted, in the game of cat and mouse, to catching the mouse and seizing his store, when, and only when, he makes his individual sorties.

I respectfully dissent from the affirmance of the judgment.

Rehearing denied.

HUTCHESON, Chief Judge, dissenting.

3. "Seizure of war materials *intended for unlawful export* generally; forfeiture

"Whenever an attempt is made to export or ship from or take out of the United States any arms or munitions of war, or other articles, in violation of law, or whenever there shall be known or probable cause to believe that any such arms or munitions of war, or other *articles, are being or are intended to be exported, or shipped from, or taken out of the United States, in violation of law,* the several collectors, * * * may seize and detain any articles or munitions of war about to be exported or shipped from, or taken out of the United States, in violation of law, and the vessels or vehicles containing the same, * * *. If upon due inquiry as provided in such sections the property seized shall appear to have been about to be so unlawfully exported, shipped from, or taken out of the United States, the same shall be forfeited to the United States." Title 22 U.S.C.A. § 401. (Emphasis supplied.)