**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jim NICOLL, Defendant-Appellant.**

**No. 80–7363.**

United States Court of Appeals,
Fifth Circuit.*
Unit B

Jan. 7, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Mary Parker, Nashville, Tenn., for defendant-appellant.

Janet King, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before RONEY, KRAVITCH and ANDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellant Jim Nicoll was convicted by a jury of conspiracy to possess and distribute a controlled substance in violation of 21 U.S.C. § 846. On appeal he contends: 1) that venue was improper, 2) that the trial court erred in admitting statements of a co-conspirator, 3) that the evidence was in-

sufficient to sustain his conviction, 4) that he was entrapped as a matter of law, and 5) that his withdrawal from the conspiracy prohibited his conviction. We reject these contentions and affirm the conviction.

### I. Background

On August 2, 1978, Frank Ader contacted the Atlanta Drug Enforcement Agency (DEA) with information concerning drug transactions in the Atlanta area. Ader implicated one James Henry in a conspiracy to acquire and distribute cocaine, and at the urging of DEA special agent Melvin Smith, Ader contacted Henry about possible cocaine deals. In a series of telephone conversations, Henry indicated interest in purchasing large quantities of cocaine for buyers in Dallas, Texas and elsewhere. Ader and Henry agreed to meet in an Atlanta restaurant to work out the details of the transaction.

On August 6, Ader and DEA agent Tyrone Yarn met Henry as agreed, and Henry inquired if Yarn's "organization" could deliver ten kilograms of cocaine per week. Toward the end of the meeting, Henry told Ader to call Jim Nicoll in Dallas to make final arrangements for the cocaine delivery, and wrote Nicoll's home and business telephone numbers on the back of a business card.[1] Henry agreed to call Nicoll and tell him to expect Ader's call.

The following day, DEA agent Smith called Nicoll at the business number supplied by Henry. Smith introduced himself as an "associate" of Ader's, and Nicoll acknowledged that Henry had contacted him to tell him to expect Ader's call. Smith and Nicoll then launched into a lengthy discussion on the details of the cocaine transaction. Nicoll insisted on a sample, which the DEA could not provide. Nevertheless, Smith and Nicoll had several other phone conversations between August and September in an attempt to work out the deal. The negotiations culminated in a meeting among Nicoll, Kathy Seeka (introduced as friend who knew a lot about cocaine), Smith, and DEA agent Gloria Woods, but

1. Henry worked for Nicoll's business, Aloesh-ine, Inc., in Dallas.

the proposed deal fell through because of Smith's refusal to provide a sample. Smith had further conversations with Nicoll and Seeka attempting to salvage the deal, but finally on December 18 Nicoll backed out, stating the negotiations were taking too much of his time.

Subsequently, Nicoll, Seeka, and Henry were indicted on drug conspiracy charges. Henry moved for dismissal on double jeopardy grounds, and his trial was severed. Seeka managed to avoid arrest and was still at large at the time of Nicoll's trial. Nicoll was tried twice: the first prosecution ended in a mistrial; the second resulted in his conviction.

## II. Venue

Appellant asserts that venue in the Northern District of Georgia is improper and therefore the conviction must be reversed. According to appellant, the only overt acts occurring in the Northern District involved Henry; if Henry is acquitted in his separate trial,[2] no overt act of the conspiracy will have occurred in the district, thus making venue improper.

■ We find this argument without merit. For a crime such as conspiracy, which by its nature can be "committed" in a number of places, *United States v. Cooper*, 606 F.2d 96, 97 (5th Cir. 1979), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 685, 62 L.Ed.2d 657 (1980), venue is proper in any district in which the government shows by a preponderance of the evidence that either the agreement or an overt act occurred. *United States v. DeLeon*, 641 F.2d 330, 336 (5th Cir. 1981). *See* 18 U.S.C. § 3237 (regulating venue for offenses begun in one district and completed in another.) Here the government's evidence showed that co-conspirator Henry engaged in several telephone conversations within the Northern District of Georgia concerning the acquisition of cocaine, and met with DEA agents in an Atlanta restaurant to work out the details of the delivery. The possible acquittal of

Henry at some future date would reflect only on his personal guilt beyond a reasonable doubt and not on whether the government proved, by a preponderance, that an overt act of the conspiracy occurred in the Northern District.

## III. Co-Conspirator's Statements

Appellant asserts that the trial court erred in admitting certain statements by Henry tending to implicate Nicoll in the cocaine conspiracy. Appellant argues that the trial court should have held a *"James hearing"* prior to admitting the hearsay statement, and that the government failed to show by a preponderance of the independent evidence that Henry and Nicoll were involved in the same conspiracy. Appellant also argues that even if the government laid the proper predicate for admissibility under the co-conspirator's hearsay exception, one tape of a conversation between Henry and the DEA is inadmissible because of a gap in the conversation.

■ We reject appellant's arguments. In *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the court delineated the standards applicable to the admission of co-conspirator's statements under Fed.R.Evid. 104(b) and 801(d)(2)(E). To admit the statements initially, the trial court must find by substantial independent evidence that a conspiracy existed, that the statements were made in furtherance of the conspiracy, and that the declarant and defendant were members of the conspiracy. *Id.* at 580–81. Upon proper motion at the close of all the evidence, the trial court must review the evidence and conclude that the government has shown the three predicates to admission by a preponderance. *Id.* at 582–83. *See United States v. Gray*, 659 F.2d 1296, 1301 (5th Cir. 1981).

■ In *James*, the court indicated that the preferred order of proof was for the

---

2. At the time of oral argument, Henry's double jeopardy claim was pending appeal in this court, and counsel for Nicoll argued that a dismissal of Henry's prosecution would also make Nicoll's trial venue improper. Henry's double jeopardy claim, however, has now been decided adversely to him, *United States v. Henry*, 661 F.2d 894, 898 (5th Cir. 1981).

government to establish the conspiracy and the connection of the defendant and declarant with it prior to offering the statements as evidence. *James, supra,* at 582. This statement led many trial judges to conduct a *"James* hearing" outside the presence of the jury to develop the conspiracy evidence before admitting any co-conspirators' statements. We have never mandated such a hearing, however, and in fact the *James* court noted that the order of proof was discretionary with the trial judge. *Id.* Our only concern in these cases was that the trial judge become familiar with the evidence of the conspiracy prior to admitting the co-conspirators' statements, and therefore avoid a wasteful mistrial in the event inadequate evidence was produced. *See United States v. Ricks,* 639 F.2d 1305, 1309 (5th Cir. 1981). Here the trial judge had already heard the government's evidence in the prior prosecution of Nicoll that ended in a mistrial. We agree with the trial court that under the circumstances a *"James* hearing" would have wasted the court's time.

█ Nor do we find that the government failed adequately to prove the predicate elements for the admission of Henry's statements. Appellant contends that the evidence aside from the statements is insufficient to connect Nicoll and Henry in a cocaine conspiracy. The independent evidence, however, included several phone calls between Nicoll and DEA agents that implicated Henry in the conspiracy. In the first phone call between DEA agent Smith and Nicoll, Nicoll acknowledged that Henry had called to tell him to expect such a call. Nicoll then launched into a long discussion with Smith about the details of the cocaine deal, leaving the inexorable inference that Henry's call had informed him of the pending cocaine transaction.[3] Henry's name re-

---

3. In relevant part, the conversation was as follows:

Mel [DEA Agent Smith]: Yes, I'm trying to contact a Mr. Jim Nicoll.
Jim [Nicoll]: Speaking.
Mel: Mr. Nicoll, I'm an associate of Mr. Ader's.
Jim: Yes.
Mel: I had a conversation yesterday with Mr. Henry. I believe he's an associate of yours.
Jim: That's correct.
Mel: Yes, we were discussing some business propositions which could possibly be of some benefit to both of us, and there were a few particulars which were giving us both a degree of difficulty which he suggested that I might directly talk over with you and that we could possibly negotiate both to a happy end.
Jim: Okay, hold on one second and let me go on my other phone.
Mel: Okay, real fine.
Jim: Be right back.
Jim: Okay, what did you say your name was?
Mel: I am an associate of Frank Ader.
Jim: Oh, yeah, okay.
Mel: Okay. The problem is we were encountering, have you spoke to Mr. Henry?
Jim: Yeah, he called me and told me that Mr. Ader was going to call me.
Mel: Yes, Uh-huh. Mr. Ader would have waited as long as he could and I said I would speak to you directly and the problem is Mr. Ader comes highly recommended but I have not had any contact with you in the past.
Jim: That's correct. Excuse me one more moment, please. My other phone. I'm gonna have to tell my secretary to hold my calls.
Mel: All right.

Jim: Okay, I'm sorry.
Mel: No, but as I was stating, we could I do, I'm a little apprehensive about it. It's just there were some of the ways that Mr. Henry wanted this to be negotiated which caused me some concern, and the concern, of course, being over the availability of the funds and to make sure of the sincerity on your part of this, uh. Like I said, it's all going on the word of Mr. Ader. Mr. A is well aware of our capabilities and he has actually seen our finished product and knows of the amount of production of the product we can get out.
Jim: And what kind of percentage is that?
Mel: Well, to be quite truthful with you, it depends upon what you're going to pay for what you get.
Jim: Well, what's available? Let me put it that way.
Mel: If it's okay for you to talk on that phone.
Jim: Everything is cool here.

\* \* \* \* \* \*

Jim: Oh, I understand that. No, here's the thing, I have money people and I can occasionally come up with some money, all right, but I have some people in the market right now. How can I get just a taste to present?
Mel: Okay. I would, I had suggested the first transaction be done this way. First, I would like Mr. Ader or my representative to meet with you in some place which is a very neutral type of location, a banking institution or something, or a professional office building, or something like this where I feel Mr. Ader or my representative would be quite safe and they could observe the sum of mon-

appeared in that conversation and subsequent conversations in the context of Henry

ey in your presence in a neutral location where I will feel that my individuals will be able to go in there, enter and leave and you will feel quite secure having your funds there and my people will feel quite secure proceeding there. After seeing the funds, I will then send you a sample of the goods. I would then like, after you approve of the sample, for the funds to be placed some place in a neutral situation with control over by one of your people and one of my people. Mr. Henry was greatly opposed to having two signatures on something actually in a legal banking institution. I do not like these motel rooms type of situation with the money in the suitcase under the bed with the two gunsels sitting around. I do not like that. There is nothing wrong with putting money in a bank with signatures on the money. One of your signatures and Mr. Ader's signature, one of my representatives. I will send you the sample; if you like the sample, I will then send you the whole package. At that time, you are to, once you get the package and you see that it's the same as the sample, you are to release the money with my representative there and the other. It has to be at a legal place where there can be no problems. After the first time, I will have no qualms about bringing you what you want if you say you have the funds. It's just I have the skepticism when people start speaking 60, 80, 90, 150 thousand dollars and I have no proof of the fact that you have this and I don't know of you. Mr. Henry is a close associate of Mr. Ader. Mr. Ader has seen what I have. There is no law against having money, but there is a law against having my product.

Jim: That's right.

Mel: So I would prefer it to be done that way. I can't see where there is any problem with that.

Jim: I see no problem. None at all.

Mel: We can set that up. I have a trip coming up to California in the next couple of days. Temporarily I'm sitting on quite a committed portion. I would like to get an idea of what you want, approximately when you want it. I will give you a delivery date. I will be there. I will be prompt. My people will be there. They will be prompt. I would like to know the banking institution, how it will be done, the signatures on it or whatever, a dual signature. It would be delivered to you, if you like keep it, if not send it back and don't touch it and take your money back out and we'll call it a day. I think that's a very admirable way of doing it.

Jim: Yes, it is. It certainly is. I'm not opposed to that at all.

Mel: Mr. Henry was opposed to it. He wanted the old motel situation.

Jim: Well, he's an old-fashioned fellow.

being a conduit for negotiations about the deal.[4] Although Henry and Nicoll were

Mel: That's not the way to do business this day and age with this much money.

Jim: Yes, okay, here's the thing, I'm going out of town tomorrow morning and I won't be back here until probably Thursday of next week.

Mel: That makes it very convenient.

Jim: Okay, so I can't, probably won't be able to contact my people till then and then it will take a few days to get up some of my people. And so, I guess it would be best for you to contact me unless you have a place that I can contact you.

Mel: I prefer to contact you at this point.

\* \* \* \* \* \*

Jim: Okay, that sounds right. Don't see anything wrong with that at all.

Mel: Okay, we shall do it. I'll just call you in about a week or so and I will tentatively hold two for you, that's about the least I will drop down and if there is that type of business, then it's worth my while to do it and I think you'll be very pleased with my product.

Jim: Okay, let me just get with my people and I'll be awaiting to hear from you on Monday the 14th.

Mel: Okay, Mr. Nicoll, one other point. Mr. Henry provided me with another number. Is that a safe number to give you a call in the evenings, let's say if it were the evening after the 14th if I were tied up during the day?

Jim: 348 number.

Mel: Yes.

Jim: Yes, that's cool.

Mel: Real fine. I should be in contact with you.

Jim: Thank you.

Mel: Take care.

4. On August 21, 1978, for example, the following exchange between Nicoll and Smith occurred:

Nicoll: Oh, we're gonna do some business. It's just that I can't be rushed into these things.

Smith: No. I can't either. It was just that, you know.

Nicoll: Well, I know... You see what happened prior to your talking to Mr. Henry I had, my man was standing by and we got blowed out on another thing that we tried to set and, of course, then I spent eight days traveling around the country trying to put that together and it didn't happen. Now my man was a little upset, which I don't blame him.

Smith: I have no problem in saying that I will supply someone with something. I will just do it.

Nicoll: I understand that...

Smith: Really no problem. We'll stay in contact through possibly Mr. Henry or some-

associates in an unrelated legitimate business, and mere association with a person involved in a conspiracy is insufficient to prove participation in the conspiracy, *United States v. Horton*, 646 F.2d 181, 185 (5th Cir. 1981), the telephone conversations between Smith and Nicoll indicated that more than simply a business relationship existed between Nicoll and Henry; we conclude that these conversations provided proof by a preponderance that a conspiracy existed and Nicoll and Henry were connected with it. *See Horton, supra*, at 184–85 (orders by one conspirator for a third party to pay large amounts of cash to a second conspirator permitted inferring agreement to defraud Federal Government and provided basis for admitting co-conspirator's statements); *United States v. Atkins*, 618 F.2d 366, 368–70 (5th Cir. 1980) (taped conversations between defendant and co-conspirator, though using "veiled language and Delphic references" provided adequate basis for admission of co-conspirator's statements).

■ Finally, we do not agree that the trial court abused its discretion in admitting a tape of a conversation between Henry and the DEA despite a short gap in the tape. In *United States v. Greenfield*, 574 F.2d 305 (5th Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978), the court held that tapes that contained inaudible portions were nevertheless admissible unless the inaudible portions were "so substantial as to render the recording as a whole untrustworthy." *Id.* at 307 (quoting *United States v. Avila*, 443 F.2d 792, 795 (5th Cir.), *cert. denied*, 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258 (1971)). Here DEA agent Smith testified that no one had tampered with the recording or deleted any portions of it; rather, the short gap of approximately one minute resulted from the tape reaching the end of one side and needing to be turned over. The resulting gap hardly rendered the tape as a whole untrustworthy, and no error resulted from its admission.

## IV. Entrapment and Police Misconduct

■ Appellant urges that his conviction cannot stand because either he was entrapped as a matter of law, or alternatively, the misconduct of the DEA was so egregious that it violated appellant's due process rights. We reject both arguments. The law of this circuit requires that to assert the defense of entrapment, the defendant must admit he committed the acts on which the prosecution is predicated. *E. g., United States v. Brooks*, 611 F.2d 614, 618 (5th Cir. 1980). Nicoll's defense throughout the case was that he only wished to "lead on" the DEA in the hope of getting a small sample of cocaine for his personal use, and specifically denied an intent to distribute cocaine as charged in the indictment. Having failed to assert entrapment as a defense at trial, Nicoll cannot now raise it on appeal.

■ Nor was the conduct of the DEA so egregious as to violate due process. For his due process argument appellant relies primarily on *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). In *Twigg* the court reversed the conviction of a defendant charged with drug conspiracy on due process grounds in light of the egregious conduct of DEA agents in the case. The evidence in *Twigg*, however, showed that the DEA had not only set up the drug operation (a laboratory for the production of "speed") but also had chosen the site, provided indispensable raw materials for the operation, and directed the operation through an informant.[5] In contrast, here the DEA essen-

---

thing and we'll keep you in mind. There's, in every week or week and half or so, we're always having something to accommodate individuals without a problem usually.
Nicoll: Wonderful.

5. As summarized by the Third Circuit:
At the behest of the Drug Enforcement Agency, Kubica, a convicted felon striving to reduce the severity of his sentence, commu-

nicated with Neville and suggested the establishment of a speed laboratory. The Government gratuitously supplied about 20 percent of the glassware and the indispensable ingredient, phenyl-2-propanone. It is unclear whether the parties had the means or the

tially only initiated contact with Nicoll, who then actively negotiated the cocaine deal. Thus while we recognize that cases may arise in which the government's conduct is so egregious as to violate due process, *see generally Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the conduct of the DEA in this case does not fall within that category.

### V. Withdrawal

■ Appellant also contends that if a conspiracy existed, he withdrew from it in a phone conversation with the DEA in December, 1978, and that therefore his conviction cannot stand. This argument is specious. While we have serious doubts whether Nicoll's statements in the December conversation constituted withdrawal under the precedents of this court,[6] even assuming Nicoll withdrew, the withdrawal came too late to avoid liability for the conspiracy. "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Ianelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975). *See United States v. Wilson*, 657 F.2d 755, 758 (5th Cir. 1981); *United States v. Winter*,

509 F.2d 975, 982 (5th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). Whether the object of the conspiracy is achieved is therefore immaterial to the commission of the crime of conspiracy.

■ Although under the general federal conspiracy statute, 18 U.S.C. § 371, a conspiracy conviction requires proof of an overt act by one of the participants, *e. g.*, *United States v. Wieschenberg*, 604 F.2d 326, 335 (5th Cir. 1979), the rule in this circuit is that a conviction for a drug conspiracy under 21 U.S.C. § 846 does not require proof of an overt act in furtherance of the conspiracy. *E. g.*, *Wilson, supra; United States v. Garcia*, 655 F.2d 59, 62 (5th Cir. 1981). *See United States v. Baker*, 609 F.2d 134, 138 (5th Cir. 1980) (no overt act required for conspiracy to import under 21 U.S.C. § 963). No Fifth Circuit case specifically has considered whether the no-overt-act rule for drug conspiracies precludes withdrawal after consummation of the agreement but before commission of an overt act. Our cases have held, however, that withdrawal is impossible once an overt act is committed.[7] *E. g.*, *United States v. Heathington*, 545 F.2d 972, 973 (5th Cir. 1977). *See United States v. Jiminez*, 622 F.2d 753, 757–58 (5th Cir. 1980) (approving

money to obtain the chemical on their own. The DEA made arrangements with chemical supply houses to facilitate the purchase of the rest of the materials. Kubica, operating under the business name "Chem Kleen" supplied by the DEA, actually purchased all of the supplies with the exception of a separatory funnel. (The funnel was secured by Twigg at the direction of Kubica who was engaged in operating the laboratory.) When problems were encountered in locating an adequate production site, the Government found the solution by providing an isolated farmhouse well-suited for the location of an illegally operated laboratory. Again, there was no cost to the defendants. At all times during the production process, Kubica was completely in charge and furnished all of the laboratory expertise. Neither defendant had the know-how with which to actually manufacture methamphetamine. The assistance they provided was minimal and then at the specific direction of Kubica.
*United States v. Twigg*, 588 F.2d at 380–81.

**6.** To prove withdrawal, a conspirator must show he acted affirmatively to defeat or disavow the purpose of the conspiracy. *E. g.*, *United States v. Killian*, 639 F.2d 206, 209 (5th Cir. 1981). In the December phone call, Nicoll stated to DEA agent Smith that he "had had it" with the negotiations and was tired of spending so much time trying to work a deal. Although the conversation indicates Nicoll was postponing any further negotiations at the time, it does not necessarily indicate Nicoll "affirmatively disavowed" the conspiracy.

**7.** Withdrawal may be an issue even after an overt act has occurred, however, if the defendant's claim is that withdrawal precludes liability for acts occurring *after* the withdrawal. *See, e. g., United States v. Killian*, 639 F.2d 206, 208 (5th Cir. 1981); *United States v. Bradsby*, 628 F.2d 901, 905 (5th Cir. 1980). Such an assertion of withdrawal nevertheless does not affect the defendant's liability for the conspiracy and any acts occurring *prior to* the alleged withdrawal.

instruction that defendant could not withdraw after commission of an overt act).

We need not decide in this case whether withdrawal from a drug conspiracy is possible prior to the commission of an overt act but after consummation of the agreement, because Nicoll's alleged withdrawal came after his meeting in Dallas with DEA agents. This meeting for the purpose of settling the details of the cocaine transaction constituted an overt act in furtherance of the conspiracy; hence, Nicoll's withdrawal, if it occurred at all, came too late to absolve him of criminal liability.

## VI. Sufficiency of the Evidence

Appellant's final assertion is that the evidence was insufficient to sustain the jury verdict. The test for reviewing sufficiency claims is whether, viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), substantial evidence exists to support the verdict. *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974) (quoting *Glasser, supra*, 315 U.S. at 80, 62 S.Ct. at 469); *United States v. Berry*, 644 F.2d 1034, 1039 (5th Cir. 1981). Our precedents have interpreted the "substantial evidence" test as evidence that would permit a reasonable jury to find guilt beyond a reasonable doubt, *United States v. Fox*, 613 F.2d 99, 101 (5th Cir. 1980), or, alternatively, evidence such that a reasonable jury could conclude was inconsistent with every reasonable hypothesis of innocence. *Berry, supra*, at 1039; *United States v. Gray*, 659 F.2d 1296, at 1302 (5th Cir. 1981). The evidence in the case before us included telephone conversations between Nicoll and DEA agents concerning the details of the cocaine purchase during which Nicoll stated he was acting as "middleman" for unspecified buyers in Dallas and elsewhere, and a meeting in Dallas among Nicoll, Seeka, and DEA agents to attempt to arrange delivery of the cocaine. We find the evidence ample to sustain the verdict.

AFFIRMED.