UNITED STATES of America,
Plaintiff-Appellee-Appellant,

v.

ONE BOEING 707 AIRCRAFT, etc., et al., Defendants-Appellees,

Servotech International Establishment,
Defendant-Appellant.

No. 83–2485.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1985.

Jack R. Bailey, Houston, Tex., for defendant-appellant.

Daniel K. Hedges, U.S. Atty., Javier Aguilar, James R. Gough, C.J. (Neil) Calnan, Asst. U.S. Attys., Houston, Tex., for U.S.

Mary Lou Andrews, Houston, Tex., for One Boeing 707, etc., et al.

Before CLARK, Chief Judge, JOHNSON, and WILLIAMS, Circuit Judges.

PER CURIAM:

This is a civil forfeiture case in which the government, upon a showing of probable cause, seized weapons and one Boeing 707 airplane which were involved in an illegal attempt to export arms to South Africa without a license.[1] After a jury trial to determine whether the weapons and aircraft should be forfeited, the district court entered judgment granting forfeiture of the weapons to the government, but denying forfeiture of the Boeing 707, returning the airplane to its owner. The owners of the weapons appeal forfeiture while the United States cross appeals the denial of forfeiture as to the airplane. We affirm as to forfeiture of the weapons and reverse the denial of forfeiture as to the Boeing 707.

I

In early 1981, Gary Howard, an arms broker acting as agent for Balotta Trading Establishment, a Liechtenstein corporation, was contacted by another arms broker, representing Servotech International Establishment ("Servotech"). Servotech, a Liechtenstein corporation, was engaged in buying and selling various commodities, including arms and weaponry. This phone call to Howard on behalf of Servotech was in regards to purchasing weapons in the United States for delivery to the Republic of South Africa. Concerned about the possible illegality of this proposed transaction, Howard contacted the Customs Service. As a result of Howard's phone call, Customs entered into an undercover operation, teaming one of its special agents, Dan Winkler, with Howard.

In mid-April 1981, Howard was contacted again by Servotech's representative and introduced to Peter Towers, who along with John Parks, were agents for Servotech. After numerous conversations between Towers or Parks and Howard, Servotech, through Howard, entered into an agreement with Balotta, whereby Balotta would purchase weapons for Servotech for export to South Africa.

On April 27, 1981, Towers met with Howard and undercover Customs Agent Winkler. Their conversation was tape recorded. At this meeting, Towers announced the shipping arrangements for the weapons had been finalized and that a phony end use certificate showing Sudan as the final destination for the weapons would disguise the true destination of South Africa.

Soon thereafter, Towers made two wire transfers totalling approximately $1.2 million to Balotta's account at the Republic National Bank in Dallas. Howard was to use this money to purchase the weapons ordered by Servotech. However, as part of the undercover operation, Howard transferred approximately $629,000 to Customs, and Customs purchased the weapons[2] for Servotech. Howard used an additional $10,000–15,000 to buy pistols for Servotech. Ostensibly, the remainder of the $1.2 million remained in Balotta's account.[3]

---

1. The United States filed this forfeiture action pursuant to 22 U.S.C. § 401 and 22 C.F.R. § 127.06 for attempted export without the legally required licenses and registrations in contravention of 22 U.S.C. § 2778, 18 U.S.C. § 371 and 22 C.F.R. articles 121, 122, 123, and 127.

2. The weapons purchased by Customs and subsequently seized and forfeited include 1,146 M16A1 automatic rifles, 259 pistols, and 100 M203 grenade launchers.

3. Servotech alleges that the government seduced some $1.2 million from Servotech which has never been returned. Servotech's claim is not properly brought against the United States because the money was delivered to Balotta and has never been in the government's possession, except for that portion used by Customs and Gary Howard to purchase the weapons which are the subject of this appeal. Testimony in the record reveals that any money remaining is not subject to control by the United States. Consequently, if Servotech seeks return of what remains of the $1.2 million wired to Balotta, its recourse lies against others than the United States.

On May 12, 1981, the weapons were delivered to Houston Intercontinental Airport by Customs agents posing as truck drivers. Towers and Parks were arrested while inspecting the weapons, but before any weapons were actually loaded on the waiting Boeing 707. Towers and Parks eventually pled guilty to wilfully attempting to export weapons without a license in violation of 22 U.S.C. § 2778(a) and (b) and 22 C.F.R. 127.01.[4]

Servotech had chartered the waiting Boeing 707 from Montana-Austria, GmbH, an Austrian based charter service. At the time the aircraft was seized, Montana-Austria had contracted with Servotech to fly a shipment from Houston to South Africa. Montana-Austria did not own the 707, but rather, leased it from Fg Flugzeugleasing GmbH ("Fg").

Fg is a West German corporation, wholly owned by Carl Press. During 1978, Fg leased the Boeing 707 to Montana-Austria. Under the lease agreement Montana-Austria was to use the 707 in routine charter flights of passengers and cargo to various parts of the world. The lease agreement contained a provision requiring Montana-Austria to abide by all national and international transport laws.[5] Fg was not involved in the daily operations of Montana-Austria, but periodically sent a representative to check on the charter service and assure proper adherence to all agreements.

On May 7, 1981, Montana-Austria sent a telegram to the Civil Aeronautics Board requesting confirmation to fly a cargo of steel fabricates to Khartoum, Sudan on May 12. A destination change to Johannesburg, South Africa was requested on May 11.[6] Press was notified of this change in destination and immediately instructed his representative in Vienna to check the flight documents and export licenses to make sure they were in order. The 707 was seized in Houston on May 12.

The basis of this civil forfeiture action is 22 U.S.C. § 401 which prohibits the illegal exportation of war materials. Section 401 permits seizure of items used in connection with an attempt to export munitions illegally and permits forfeiture of all arms and vehicles seized pursuant to this statute.

■ Civil forfeiture laws require the government make a showing of probable cause before it seizes an item used in violation of its laws. *See United States v. One 1978 Mercedes Benz, Four-Door Sedan,* 711 F.2d 1297 (5th Cir.1983); *United States v. One 1975 Ford Pickup Truck,* 558 F.2d 755, 756 (5th Cir.1977); *United States v. One 1973 Pontiac Grand Am,* 413 F.Supp. 163, 165 (W.D.Tex.1976). A probable cause proceeding as to the arms and Boeing 707 was held on April 18, 1983. After a two-day hearing, the district court ruled the government had probable cause to seize the weapons and aircraft under the belief that Servotech's agents, Parks and Towers, were attempting to transport the weapons to South Africa in violation of Customs regulations.

After the court found probable cause, a jury was asked to determine the fact issues relating to forfeiture. Through special verdicts, the jury declared that (1) the weapons were the subject of an illegal export attempt; (2) Fg did not consent to or participate in the attempt; (3) Montana-Austria

---

4. The guilty pleas of Towers and Parks do not bind Servotech in this action. As a separate corporate entity, Servotech is not estopped by the guilty pleas of its agents from seeking to protect its property from forfeiture. The criminal admissions of Towers and Parks in no way constitute a waiver of any defenses available to Servotech.

5. The lease provision provided as follows:
 The lessee agrees to only use the aircraft in compliance with any national and international air traffic rules and laws and not to transport goods or persons whose transportation is prohibited by national or international provisions.

6. Due to international time changes there is some uncertainty as to the exact timing of this interchange. Press was in New York when he received word of Montana-Austria's requested destination change and shortly thereafter flew to West Germany. It appears, however, that the request was made less than 48 hours before the seizure occurred.

**1284**

did consent to or participate in the illegal exportation attempt.[7]

Fg sought a judgment in its favor arguing that the government should be denied forfeiture of the aircraft based on the jury's finding that it did not consent to or participate in the illegal export attempt. Servotech filed a Motion for Judgment Notwithstanding the Verdict. The district court entered judgment granting Fg's motion to deny forfeiture of the aircraft. Servotech's motion was not granted and the weapons were forfeited to the government.

## II

We deal first with Servotech's appeal of the decision to forfeit the weapons to the United States. Servotech presents two arguments as to why forfeiture of the weapons should be denied. First, Servotech argues the government's conduct in its undercover operation was so outrageous as to make forfeiture a denial of due process. Second, Servotech argues as a matter of law its agents never attempted to export and no regulations existed to make exporting munitions illegal. These arguments are without merit.

## A

Servotech argues forfeiture is unwarranted in this case due to government misconduct in the use of over zealous law enforcement techniques. Essentially, Servotech claims its due process rights were violated by the seizure and forfeiture of property (munitions and money) involved in a crime the government had such a heavy hand in committing. As Servotech states,

at issue is whether law enforcement conduct fell below societal standards so that the public would regard such conduct an abuse of government power. Thus framed, we find the conduct of the government and its citizen informer, Gary Howard, perfectly proper and well within the confines of acceptable behavior by law enforcement officers.

Servotech's due process argument borrows heavily from concepts developed in the law of criminal entrapment. Servotech's position is that regardless of whether its agents, Towers and Parks, were predisposed to commit the crime, the conduct of Customs agents was so outrageous as to violate notions of fundamental fairness. Servotech contends that such behavior could prevent a criminal conviction,[8] and therefore should deny civil forfeiture as well.

Servotech's argument is not an entrapment argument. Rather, it is the due process aspect of entrapment and entrapment-like fact situations which involve undercover operations. Such operations often find law enforcement officials intimately involved in the commission of a crime. This circuit recognized a due process defense within the context of entrapment in *United States v. Tobias*, 662 F.2d 381 (5th Cir. 1981).[9] However, *Tobias* indicated that a due process violation would be found in only "the rarest and most outrageous circumstances." *Id.* at 387. Outrageous conduct turns upon the totality of the circumstances. *Id.* Therefore, to determine whether due process has been violated in this civil forfeiture case, we look to the totality of the circumstances and balance

---

**7.** Montana-Austria is not a party to this suit; the company went into bankruptcy in Austria shortly after the seizure at issue in this case.

**8.** Servotech structures its argument from language in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), where the Supreme Court acknowledged "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction ...." *Id.* at 431-32; 93 S.Ct. at 1643. This possibility was

reiterated by a majority of Justices in the plurality opinion *Hampton v. United States,* 425 U.S. 484, 489, 96 S.Ct. 1646, 1649-50, 48 L.Ed.2d 113 (1976).

**9.** Other Fifth Circuit cases on the due process aspect of entrapment include *United States v. Garrett,* 716 F.2d 257, 275 (5th Cir.1983); *United States v. Lane,* 693 F.2d 385, 388 (5th Cir.1982); *United States v. Nicoll,* 664 F.2d 1308, 1314 (5th Cir.1982); *United States v. Gray,* 626 F.2d 494 (5th Cir.1980); *United States v. McClure,* 577 F.2d 1021 (5th Cir.1978).

government involvement against the extent of participation and predisposition of Servotech's agents to commit the crime. *Id.*[10]

■ Of prime importance in rejecting Servotech's due process argument is that Gary Howard, who supplied the tip to the Customs Service, was at all times a private citizen. He was neither a paid informant nor employed by the government. The evidence showed that Howard did not initiate contact with Servotech. Rather, he was approached by an arms broker representing Servotech in regards to obtaining arms for export to South Africa.[11] After this initial telephone call, Howard voluntarily notified the Customs Service of a potentially illegal transaction. There is no evidence that Howard was instructed by Customs to initiate further contact. Rather, Howard was merely to tape record any conversations which he might have with Servotech or its agents and representatives. Servotech's representative arms broker contacted Howard a second time, again by telephone. This second call introduced Howard to Servotech's agents, Towers and Parks, and was the springboard from which negotiations began for the procurement of weapons which Servotech would attempt to export to South Africa. This evidence shows Servotech initiated contact and followed through without any evidence of prodding or inducement by the government or its informant.[12] Clearly, then, Towers and Parks were predisposed to commit this crime, which was avoided only through the voluntary participation of Gary Howard.

Moreover, the evidence shows Towers and Parks were more than just predisposed to commit the crime. The nature of Towers' and Parks' involvement in the scheme as "predisposed active participant[s]," *see Tobias*, 662 F.2d at 387, dramatically dilutes Servotech's claim of government misconduct. Towers and Parks planned the entire transaction and were fully committed to its execution. After receiving an arms order from the Armaments Corporation of South Africa, Ltd., Servotech initiated and completed negotiations with Howard for the arms purchases. Servotech's agents obtained a phony end use certificate for delivery to the Sudan, supplied the money and arranged air transport with Montana-Austria. Throughout this scheme, Servotech's role predominated. By procuring the arms, government agents played only a small, albeit instrumental, part in the process.

■ In reviewing the government's role, we find nothing irregular or outrageous in the fact that Customs actually purchased the weapons after Servotech wired money to Howard, who in turn transferred a portion of the money to Customs. After being alerted to Towers' and Parks' predisposition to export arms illegally, the government was entitled to test their intent to attempt this crime by putting these weapons at their disposal and to institute forfeiture proceedings upon commission of the crime. The fact that government officers or employees merely afforded the opportu-

**10.** Although this method of analysis smacks of entrapment related legal theories, we do not mean to imply that entrapment is available as a defense to civil forfeiture. *See United States v. One 1972 Wood, 19 Foot Custom Boat,* 501 F.2d 1327, 1330 (5th Cir.1974). Because Servotech relies on entrapment related due process theories to argue the government is barred from seizing its property, we must similarly look to an entrapment analysis as the benchmark for determining whether the government's behavior in this case violated due process. Our focus is the determination of outrageous conduct. We look to entrapment concepts solely as an analytical tool for making that determination.

**11.** The evidence adduced at trial established that Servotech received a purchase order from the

Armaments Corporation of South Africa, Ltd. on October 30, 1980 for 1000 M16A1 rifles, 700 M203 grenade launchers, 250 M16A1 carriers and 20 commando rifles. This order was received four months before Howard was first contacted by Servotech's representative in late February or early March 1981.

**12.** *Cf. Williamson v. United States,* 311 F.2d 441, 445 (5th Cir.1962) (Information supplied by an informer pursuant to a contingent fee arrangement whereby the informer was to provide evidence against named individuals for crimes not yet committed presented obvious "opportunities for abuse.").

nity or means for the commission of the offense will not defeat the resulting criminal penalties. *United States v. Russell,* 411 U.S. 423, 435; 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973); *United States v. Tobias,* 662 F.2d 381, 384 (5th Cir.1981). We see no reason not to apply this tenet to civil forfeiture penalties as well.

■ Nor do we find fault in what Servotech claims were "weeks of duplicity" during which government undercover agents worked with Towers and Parks to execute the illegal transport. Just as artifice and stratagem will not defeat criminal prosecution, the mere fact of deceit will not defeat forfeiture.[13]

Contrary to Servotech's assertions, we do not see how Towers and Parks were led down the "primrose path" against their will. The government may have followed Towers and Parks down that path, but Towers and Parks were clearly in the lead. There was no overreaching on the part of government agents, and the degree of government involvement when considering the totality of the circumstances was not outrageous.[14] We find no government misconduct and hence no due process violations. Because our holding is based on a finding of no government misconduct, we expressly pretermit as an issue whether government misconduct, if present, would affect forfeiture.

**B**

In its second argument, Servotech asserts that as a matter of law no illegal attempt to export arms was ever made by Servotech's agents, Towers and Parks. There are two aspects to this argument. Servotech argues that because the alleged export attempt was not "presently imminent," it technically was not an "attempt" under the law. Servotech also argues that at the time of arrest no arms export regulations were in force to make their attempt to export illegal.

We find the argument that Servotech's actions did not rise to the level of a bona fide attempt without merit. Unlike the cases Servotech relies on to support its claim that as a matter of law imminence was absent in this case,[15] Towers and Parks had more than "mere intention." *See United States v. Moreno,* 182 F.2d 258, 259 (5th Cir.1950). These weapons were not merely stored in a warehouse subject to a vague intention to unlawfully export

---

**13.** For examples of cases upholding the use of deception by government agents to expose criminal activity, see *United States v. Russell,* 411 U.S. 423, 435–36; 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973); *Lewis v. United States,* 385 U.S. 206, 208–09, 87 S.Ct. 424, 425–27, 17 L.Ed.2d 312 (1966); *Sorrells v. United States,* 287 U.S. 435, 441–42, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932); *United States v. Lane,* 693 F.2d 385, 388 (5th Cir.1982); *United States v. Tobias,* 662 F.2d 381, 386 (5th Cir.1981).

**14.** Our decision is in accord with the due process related entrapment cases of this circuit. *See, e.g., United States v. Lane,* 693 F.2d 385, 387 (5th Cir.1982) (Contingent fee payments did not violate due process when informant voluntarily approached police with interest in becoming informant and government did not target individuals for informant's efforts); *United States v. Nicoll,* 664 F.2d 1308 (5th Cir.1982) (Although DEA agents initiated contact, defendant actively negotiated deal for cocaine); *United States v. Tobias,* 662 F.2d 381 (5th Cir.1981) (Government conduct was not outrageous where DEA set up chemical supply company to detect illicit drug manufacture and urged defendant to man-

ufacture amphetamines after he cancelled his order for cocaine supplies); *United States v. Gray,* 626 F.2d 494 (5th Cir.1980) (No due process violation; although government agents not only suggested the drug smuggling scheme, but also furnished defendants with repair services, an air strip and a crew).

**15.** Much of Servotech's argument hinges on cases which focus on outmoded statutory language. *See e.g., United States v. Moreno,* 182 F.2d 258 (5th Cir.1950); *Rimmer v. United States,* 172 F.2d 954 (5th Cir.1949). These cases were decided prior to 1953 when the United States was entitled to forfeiture when "the property seized shall appear to have been *about to* be" unlawfully exported. 22 U.S.C. § 401 (emphasis added). However, 22 U.S.C. § 401 has been amended. The pertinent language now permits forfeiture whenever there is probable cause to believe that arms or munitions of war *"are intended to be or are being"* exported. (Emphasis added). The "about to" language upon which Servotech centers its argument for "present imminence" has been excised. Consequently, we find the authority Servotech cites unpersuasive.

them at a distant time in the future. *Cf. Moreno,* 182 F.2d at 259 (tires intended to be illegally exported to Mexico stored in claimant's home). Towers and Parks took specific and significant steps toward fulfilling their intent. Besides ordering the weapons and securing air transportation and phony documents, Towers and Parks arrived at the airport on the scheduled day of departure and were inspecting the weapons immediately prior to loading the airplane.

 Thus, they acted beyond mere preparation, in such a way that all steps had been taken towards commission of the crime itself.[16] That the weapons were at the airport ready to be loaded on an airplane that would depart for South Africa within hours is sufficiently imminent to qualify as an illegal attempt, regardless of whether the weapons were actually loaded on the plane or whether the plane was set in motion toward actual departure. The fact that, unbeknownst to Towers and Parks, undercover government involvement made any actual export impossible does not alter the jury's finding sufficient intent and overt acts to warrant a conclusion of attempted export. When the facts show that neither the intention to export nor the plan by which it would be carried out have been abandoned, but rather, both are actually continuing, an attempt to export illegally has been made as a matter of law. *Zarranz v. United States,* 182 F.2d 650, 652 (5th Cir.1950).

Servotech's second argument related to the crime of attempt contends that the federal regulations on which the govern-

ment based forfeiture of the weapons do not apply to attempted export. Servotech claims these regulations apply only to imports and that at the time of the seizure no law had been promulgated to proscribe attempts to export weapons.

Servotech structures its argument on a series of presidential executive orders issued to implement enforcement of arms control statutes.[17] President Eisenhower originally delegated his authority under these statutes to the Secretary of State in Executive Order 10575. Executive Order 10973, signed by President Kennedy, created regulations to control international arms trafficking. These regulations, embodied in 22 C.F.R. articles 121–127 delineate the munitions list, registration and licensing requirements, and the violations, penalties, and administrative remedies for exports or attempted exports of listed munitions without a license. Servotech argues that Executive Order 11432, signed by President Johnson on October 22, 1968, abrogated these arms regulations as they pertained to export. Specifically, Servotech cites the following language from Executive Order 11432 to support its contention:

> Sec. 2. *All regulations issued and presently in effect* pursuant to Section 414 of the Mutual Security Act of 1954, as amended, *shall, insofar as they relate to control of the import of arms,* ammunition and implements of war, including technical data relating thereto, *continue in effect and be administered by the Secretary of the Treasury* until revoked or superseded by him. All pending applications for import licenses not acted

---

**16.** Servotech does not complain of the court's charge to the jury on "attempt" which was as follows:

> By the term "attempt," the law means acting beyond mere preparation in such a way that all steps have been taken towards commission of the crime itself.

**17.** Section 414 of the Mutual Security Act of 1954 provided the original authority for issuance of the executive orders relied on by Servotech. This section is now codified at 22 U.S.C. § 2278 and reads in pertinent part as follows:

> In furtherance of world peace and the security and foreign policy of the United States, the

President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.
> 22 U.S.C. § 2778(a)(1).

upon by the Secretary of State at the date of this order shall be transferred to the Secretary of the Treasury for appropriate action. (Emphasis added).

Servotech claims this executive order abrogated all export and import regulations, but immediately renewed only *import* regulations as indicated by the emphasized language above. Servotech asserts that subsequent to Executive Order 11432 all export regulations vanished. Thus, Servotech reasons that at the time the weapons were seized the regulations embodied in 22 C.F.R. articles 121–127 were either promulgated without authority or pertained only to the *import* of arms and did not proscribe the export activity in question.

■ This interpretation is implausible. Executive Order 11432 abrogated neither import nor export laws. It merely transferred the administration of import regulations from the Secretary of State to the Secretary of the Treasury. Export regulations remained in effect, unaffected by Executive Order 11432 and therefore, fully operable to proscribe Servotech's attempt to export munitions to South Africa without a license.

### III

The government cross appeals to contest the denial of forfeiture as to the Boeing 707. The jury found, based on a preponderance of the evidence, that (1) the owner, Fg, had not consented to or participated in the illegal attempt to export the weapons; and (2) the operator of the aircraft, Montana-Austria, did consent to and participate in the illegal export attempt. In accord with this finding, the trial judge denied forfeiture and returned the aircraft to Fg.

The court ruled, as a matter of law, that the aircraft was a common carrier and, therefore, subject to the statutory common carrier exception to forfeiture under 19 U.S.C. § 1594. However, because the jury concluded that Montana-Austria, the operator of the aircraft, did consent to the illegal act, the statutory common carrier exception could not be invoked to protect the plane from forfeiture. We agree.

The district court based denial of forfeiture on the due process exception to forfeiture suggested by the United States Supreme Court in *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). In *Calero-Toledo,* the Supreme Court permitted forfeiture of a leased pleasure yacht after police found marijuana aboard. The Supreme Court upheld the seizure and forfeiture as constitutional despite lack of prior notice or hearing and despite the fact that the leasor was neither involved in nor aware of the unlawful use of the yacht. "Statutory forfeiture schemes are not rendered unconstitutional because of their application to the property interests of innocents." 416 U.S. at 680, 94 S.Ct. at 2090. Because the vessel is treated as the offender without regard to the owner's conduct, "the innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense." *Id.* at 683, 684–86, 94 S.Ct. at 2092, 2093. The Supreme Court also noted, in dicta, that forfeiture may be "unduly oppressive" in circumstances where an owner "proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property." *Id.,* at 689–90, 94 S.Ct. 2094–95. The Supreme Court suggested that should an innocent property owner meet this standard, forfeiture could raise a due process question. *Id.* However, the owner in *Calero-Toledo* did not meet this exception because no allegation or proof was offered that the company did all that it reasonably could to avoid having its property put to unlawful use. *Id.* at 690, 94 S.Ct. at 2095.

This two-pronged test was applied by the district court to deny forfeiture of the 707. The first prong of the test, "uninvolved in and unaware of the wrongful activity," was decided by the jury in answering its special verdict. The correctness of this determination is not at issue. The second prong, requiring a property owner to do "all that reasonably could be expected to prevent the proscribed use of his proper-

ty," was found by the district judge in response to Fg's Motion for Finding and Judgment. To reach its conclusion that "Fg did all that ... reasonably could be expected of an aircraft leasing company to prevent illegal use of its aircraft," the district court made three underlying specific fact findings: (1) Fg had instructed Montana-Austria in the aircraft lease to not transport goods "whose transportation is prohibited by national or international provisions;"[18] (2) Fg had instructed Montana-Austria regarding the use of the aircraft; and (3) Fg had stationed an agent in Montana-Austria's office to supervise cargo shipments. From these findings the district court reached the factual conclusion that Fg had met the second prong of the test outlined by the Supreme Court in *Calero-Toledo.*

These underlying findings were based on the testimony of Fg's sole owner, Carl Press. The government does not dispute these findings, but rather, asserts that their cumulative effect fails to meet the standard laid out by the Supreme Court in the exception to the *Calero-Toledo* doctrine. We agree.

A party whose property has been seized has the burden of proof to show he has done all that reasonably could be expected to prevent the illegal use of his property. That burden cannot be defined in precise, universal terms. Its operative texture—reasonableness—depends on the facts of the particular situation to which it is applied. We can only observe that "reasonably" is woven into the stout fabric of "all that could be expected." The standard was intended to be high. However, it cannot be so strict that it fails to consider commercial realities that face those who transact business in the international marketplace.

Each of the district court's specific findings is supported by the record and therefore not clearly erroneous. However, the record reveals that these actions were taken in the normal course of Fg's business as leasor to Montana-Austria, prior to the occurrence of the events which led to seizure of the airplane. These findings do not relate to the actions Press took upon being alerted to possible illegal conduct by Montana-Austria.

The evidence concerning Montana-Austria's activities during the bulk of the lease period disclosed no reason to suspect it was involved in illegal activity. Press' periodic checks of Montana-Austria's operations disclosed no more than that the charter service routinely transported passengers, and on rare occasion cargo, to various parts of the world. The normalcy of these operations changed, however, when Press was told by his delegate that Montana-Austria requested a stop off in Johannesburg on its way to the Sudan. Press testified that upon hearing this he was very upset, that he felt this change would be illegal without a flight plan and asked his delegate in Vienna to make certain there were proper documents and licenses for a flight from Houston to Johannesburg.[19]

Once Press was put on notice that Montana-Austria was about to engage in activity with his property that he thought would be illegal, his duty to do "all that reasonably could be expected" to prevent forfeiture increased. Strict forfeiture laws

---

18. *See supra* note 5.

19. Press testified to the following at trial:
 I had a phone call from Vienna, and my delegate in Vienna told me. And if I recall correctly, this was on a Friday or on a Saturday, meaning two days before the aircraft was seized in Houston, and he called me in regard to some other matters concerning my businesses, and at the end he mentioned just by chance, I think, said that Montana wanted to use the aircraft on a charter to Khartoum; said they had been asking if they could, while in flight to Khartoum, could change flight plans into Johannesburg, South Africa, and that really upset me. I said, "We don't do any of such things." If they know their destination, it's Johannesburg, since they have to fly a flight plan into Johannesburg and not take any detours, because I felt that this would be illegal. I further asked my delegate in Vienna to make sure that there would not be a charter signed or accepted without having proper documents, export licenses and whatever other official documents would be required to carry out that flight from Houston into Johannesburg.

serve to prevent negligent entrustment of property. "To the extent that such forfeiture provisions are applied to lessors, bailors, or secured creditors who are innocent of any wrongdoing, confiscation may have the desirable effect of inducing them to exercise greater care in transferring possession of their property." *Calero-Toledo,* 416 U.S. at 467–68, 94 S.Ct. at 2094. Thus, when Press became aware that possible illegal activity was afoot, he should have known he could no longer rely on the course of action he had been taking prior to his awareness of any irregularity. Once his suspicions were aroused he had an affirmative duty to take more effective steps to protect his property from illegal use and subsequent forfeiture. Yet, the proof shows that he merely instructed his delegate to secure proper documentation.

Here, the plane was seized within forty-eight hours of Press' conversation with his delegate in Vienna. Acknowledging that time and distance could have deterred personal involvement, this court need not require of Press that he contact regulatory authorities to determine whether proper flight plans were filed or the required end use certificates had been obtained. But we must reverse if we insist on no more than what Press himself acknowledged was necessary—a check on the documents required to fly from Houston to Johannesburg. Even using this minimum gauge, Press has failed to meet the standard. We find the record devoid of any proof that Press' agent checked with Montana-Austria or reported back to Press or that Press ever checked with his agent or anyone else to determine that his instructions had been executed.[20] The finding of the district court that Press did all that reasonably could be expected of an aircraft leasing company to prevent this illegal use of its

aircraft is not supported by the record and is clearly erroneous.

The judgments appealed from are affirmed as to the forfeiture of the weapons seized and reversed and rendered as to the denial of forfeiture of the Boeing 707 aircraft. Costs of the appeals are assessed equally against Servotech International Establishment and One Boeing 707 aircraft.

AFFIRMED IN PART and, IN PART, REVERSED and RENDERED.

---

**20.** To the contrary, Press testified as follows:

After I had that telephone call on Friday or Saturday, I flew back to Germany. I was at that time in New York, and Monday morning I had a call from an Austrian newspaper asking me if I would have any comment or if I would want to say anything about the seizure of a Montana operated aircraft of the type 707. And I was very upset and angry, and I told him I have no knowledge of this .... Next thing, I called our delegate in Vienna and asked him about it. And he was also not aware of this incident, and he said, "I also have to check ...."