122 N.J. Super. 225 (1973)
300 A.2d 154
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH ZICARELLI, FRANK MALLAMACI, WILLIAM C. FOURGEREL, JR. AND LUDWIG BRUSCHI A/K/A NINNI, DEFENDANTS-APPELLANTS AND JOHN ARMELLINO, MICHAEL ARMELLINO AND WILLIAM C. FOURGEREL, SR., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 1972.
Decided January 29, 1973.
*228 Before Judges FRITZ, LYNCH and BARRETT.
Mr. Michael A. Querques argued the cause for appellant Joseph Zicarelli (Messrs. Isles & Weissbard, attorneys).
Mr. I. Mark Cohen, Assistant Deputy Public Defender, argued the cause for appellant Frank Mallamaci (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Elmer J. Herrmann argued the cause for appellant William C. Fourgerel, Jr. (Messrs. Herrmann and Blasi, attorneys).
Mr. John P. Russell argued the cause for appellant Ludwig Bruschi.
*229 Mr. Michael R. Perle, Deputy Attorney General, argued the cause for respondent (Mr. George F. Kugler, Attorney General, attorney).
The opinion of the court was delivered by LYNCH, J.A.D.
Defendants Joseph Zicarelli, Frank Mallamaci, William Fourgerel, Jr., William Fourgerel, Sr. and Ludwig Bruschi, a/k/a Ninni, were charged in a 14-count state grand jury indictment with conspiracy to corrupt Mayor John Armellino of West New York, Hudson County, New Jersey, to the end that an illegal gambling enterprise being conducted by said defendants would be kept free of prosecution. Also indicted and charged as participants in the same conspiracy were defendants John Armellino and his brother Michael Armellino.
The indictment charged that Zicarelli, Mallamaci, both Fourgerels and Bruschi operated an illegal gambling enterprise consisting of lottery and bookmaking between November 1965 and April 1970. In addition, John Armellino was indicted for misconduct in office in failing to enforce the criminal laws of the State, and in using his office to keep safe from investigation and prosecution the gambling enterprise being conducted by the defendants Zicarelli, Mallamaci, the Fourgerels and Bruschi. The Armellinos were also indicted for having received bribes for their said misconduct and Zicarelli, Mallamaci and Fourgerel, Sr. were indicted for corruptly aiding, abetting and causing the payment of the bribes.
Michael and John Armellino pleaded guilty to the conspiracy counts and their cases were severed for trial. Both testified on behalf of the State.
Defendants Zicarelli, Mallamaci, Fourgerel, Sr., Fourgerel, Jr. and Bruschi were convicted and received various sentences to State Prison and fines, together with an assessment against Zicarelli and Mallamaci of one-fifth of the trial costs against each. This appeal followed.
*230 The contentions of defendants may be summarized as follows: (1) the venue was improperly laid in Burlington County; (2) the court erred in allegedly refusing to ask the jurors finally selected whether they had been exposed to any publicity concerning the case; (3) the court erred in permitting the recording of several conversations between one Policastro and several of the defendants to be received in evidence and in allowing the jury to use a state-prepared transcript of the recordings as a listening aid; (4) defendants' motion for judgment of acquittal should have been granted; (5) the court erred in its charge to the jury; (6) defendant Zicarelli contends that the court erred in permitting testimony that he was in custody during part of the time covered by the indictment; (7) the court erred in permitting the State to proceed with its proofs that one Fluccari was a co-conspirator and in permitting the State to adduce testimony that Fluccari could not be found; (8) the court erred in permitting a state trooper to testify concerning the structure of a lottery organization and permitting a chart depicting the same to be received in evidence; (9) Zicarelli contends that the court erred in sustaining numerous objections made by the prosecutor during the summation of Zicarelli's attorney; (10) defendants Zicarelli and Mallamaci contend that the sentences imposed upon them were illegal insofar as they included an assessment against each of them of one-fifth of the costs of trial, and (11) defendant Mallamaci contends that the sentence imposed upon him was excessive and should be reduced.
Defendants Fourgerel, Jr. and Bruschi join in the contentions made by Zicarelli and Mallamaci as to Points 1, 3 and 4. Fourgerel, Sr. did not appeal.[1]

*231 A

Venue
The indictment here involved (SGJ 2-70-8H) was one of a series of seven indictments which were returned by the state grand jury (selected pursuant to N.J.S.A. 2A:73A-1 et seq.) and in all of which Joseph Zicarelli was a named defendant. All seven charged offenses committed in Hudson County. One (SGJ 2-70-8A) also charged a conspiracy taking place in Bergen, Hudson and Burlington Counties, and one (SGJ 2-70-8B) charged a conspiracy said to have occurred in Mercer and Hudson Counties, and elsewhere.
The venue of the within indictment, the last of the seven to be returned, was laid in Burlington County by Judge Kingfield, the assignment judge designated by the Chief Justice to administer state grand jury proceedings as provided in the State Grand Jury Act (N.J.S.A. 2A:73A-2).
Defendants' first contention is that the trial court erred in denying their motion for change of venue to Hudson County. The argument is that (1) R. 3:14-1 requires that an offense shall be prosecuted in the county where it was committed; (2) the Sixth Amendment to the United States Constitution guarantees an accused the right to trial by an impartial jury in the county wherein the crime has been committed, and (3) the allocation of venue to Burlington County, without an adversary hearing in the first instance, denied defendants due process of law.
Of the seven indictments, the venue of the first (SGJ 2-69-2) was initially laid in Hudson County. Venue on the next five was initially laid in Mercer County (SGJ 2-70-8A, 8B, 8C, 8D and 8E). The Attorney General filed a petition with Judge Kingfield seeking to have the first indictment (SGJ 2-69-2) changed from Hudson to Mercer County where the other five had been allocated. Without notice to defendants an order was entered effecting the change of venue to Mercer County. However, on October 9, 1970 the Attorney General filed another petition seeking *232 to transfer the six indictments (the instant indictment had not yet been returned) to Burlington County. The grounds asserted were that defendant Zicarelli was incarcerated in Burlington County, the prosecution required protection of its principal witness (Peter Policastro), whose personal safety was in danger for which security arrangements could adequately be made in Burlington County, and that all cases involved common questions of law and fact to be best disposed of by a single judge. Again, without notice to defendants, the court entered an order reallocating the indictments to Burlington County.
Shortly thereafter, the subject indictment (SGJ 2-70-8H) was returned and Judge Kingfield designated Burlington County as the venue for trial.
On January 8, 1971 all defendants moved before Judge Van Sciver, to whom the cases had been assigned for trial, for an order to reallocate venue to Hudson County. The motion was denied. However, the Supreme Court remanded the matter to Judge Kingfield to decide the question of venue anew, in order to give defendants an opportunity to oppose the State's petition  an opportunity which they had not been afforded on the original allocation to Burlington County.
After a hearing Judge Kingfield decided that Burlington County was the proper county for venue. He stated his reasons: (1) "somewhat a matter of convenience"; (2) the availability of a judge and a courtroom in Burlington County; (3) the State Grand Jury Act (N.J.S.A. 2A:73A-3) created a district which embodies the entire State, and the act authorized the designated assignment judge to allocate the venue of trial; (4) in adopting R. 3:14-1 the Supreme Court did not contemplate the state grand jury, and the rule was not intended to apply to it; (5) the security of state witness Policastro, an "important factor," could be maintained better in Burlington County; (6) the Sixth Amendment to the United States Constitution did not stand in the way of Burlington County venue; *233 (7) there would be less publicity there than in Hudson, and (8) there would be an impartial jury which would give defendants a fair trial and defendants would suffer no prejudice by Burlington County venue.

R. 3:14-1
This is the venue rule normally applicable to county grand juries and would, with certain exceptions not applicable here, require trial in the county where the offense was committed.
The State Grand Jury Act (N.J.S.A. 2A:73A-3) contemplates a grand jury quite unlike the traditional county grand juries. Its powers are set forth in N.J.S.A. 2A:73A-3:
A State grand jury shall have the same powers and duties and shall function in the same manner as a county grand jury established pursuant to Title 2A of the New Jersey Statutes except that its jurisdiction shall extend throughout the State. The law applicable to county grand juries shall apply to State grand juries except insofar as they are inconsistent with this Act. The Supreme Court may promulgate such rules and regulations as it deems necessary to govern particularly the procedures of State grand juries. [Emphasis added]
The act has also dealt with the problem of venue in the following manner:
Any indictment or presentation by a State grand jury shall be returned to the assignment judge without designation of venue. Thereupon, the judge shall, by order, designate the county of venue for the purpose of trial * * *. [N.J.S.A. 2A:73A-8; emphasis added]
There is no doubt that one of the purposes of the State Grand Jury Act was that it was to be unfettered by the limitations of a county grand jury. To that end it was given state-wide jurisdiction and venue was to be directed by the assignment judge designated by the Chief Justice.
Venue is not a matter of jurisdiction, nor is it of constitutional dimension. State v. Di Paolo, 34 N.J. 279, *234 cert. den. 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961). It must not bow to circumstances which no longer exist. In Di Paolo, the court said:
* * * Although a rule developed at early common law that a prosecution be instituted in the county in which the crime was committed, the reasons seem unrelated to the stated aim of the guarantee. Rather the rule reflected a practice made necessary by circumstances which no longer exist. Communities were scattered and travel difficult. Petit jurors decided causes upon their personal knowledge rather than upon the testimony of witnesses and probably grand jurors as well relied upon what they knew or learned from their neighbors. That the concept of venue was not thought to be an essential attribute of the procedural guarantee is evidenced by the fact that when changing circumstances made the then concept of venue a fortuitous haven for the guilty, Parliament enacted numerous exceptions to the common law rule and did so long before the separation of the American colonies. [34 N.J. at 285-286; emphasis added]
And, again demonstrating the subservience of venue concepts to legislative purposes and accommodation to changing needs, the Supreme Court said in Di Paolo:
Thus at the time of the adoption of the American constitutions the common law rule of venue had already been modified by legislation designed to meet situations for which the general rule was inadequate or inapt. Moreover, the nature of the subject suggests that room must be left for accommodation with changing needs, * * *.

* * * * *
This conclusion is fortified by the fact that our Legislature has dealt with the subject of venue without, so far as we know, any question as to its constitutional authority to do so. See State v. Wyckoff, supra (31 N.J.L. 65 at p. 69); State v. James, 96 N.J.L. 132, 148 (E. & A. 1921); R.S. 2:184-1 to 6; L. 1944, c. 198 § 1, p. 715, N.J.S.A. 2:184-2.1. [Emphasis added]
R. 3:14-1 was adopted when there were only county grand juries. Necessarily, then, only such juries were contemplated in the adoption of the rule. The state grand jury, on the other hand, was created because of the need to investigate and prosecute crime without regard to county boundaries. It was premised on the notion that the institution of the state grand jury can cope with the problems of modern law *235 enforcement only if it be relieved of outmoded concepts of jurisdiction and vicinage which too often have imposed an artificial restraint on grand jury probes and a particular burden upon inquiries into syndicated criminal activities. Statement of Governor Hughes, signing S. 654, December 16, 1968. It is a new weapon, or agency, created by the Legislature to enforce the criminal law, just as creation of a new police force would be such an instrument. In that instance it could not be said that creation of the State Police was merely a matter of procedure committed solely to the courts (cf. Winberry v. Salisbury, 5 N.J. 240 (1950)), but rather a matter of substance created by the Legislature to aid the executive arm of the government in enforcement of the law. The power of the designated assignment judge to allocate venue is a reasonable implementation of that agency to serve the end ordained by the Legislature. Thus, the question of venue under the State Grand Jury Act is not, by use of the "broad brush," to be brought within the purely "procedural" framework of Winberry v. Salisbury, supra.
The Chief Justice of our Supreme Court accepted his responsibility under the State Grand Jury Act and designated Judge Kingfield as the assignment judge thereunder. In doing so he clothed that judge with the authority, as provided by N.J.S.A. 2A:73A-2, to designate the county of venue. Implicitly, he recognized that R. 3:14-1 was here inapplicable. We so hold. If it be assumed, as defendants argue here, that venue is solely for the Supreme Court's direction and within its control, the answer must be the same. It must be presumed that the court was well aware of the venue provision of the State Grand Jury Act, as well, of course, of its own R. 3:14-1. The court's failure to amend that rule to cover indictments returned by a state grand jury bespeaks an intent on the part of the court that the venue provisions of the statute (i.e., that venue was to *236 be allocated by the assignment judge designated by the Chief Justice), were acceptable to the court and were not contrary to its intent.
In any event, under R. 1:1-2, Judge Kingfield could have relaxed R. 3:14-1 in assigning venue to Burlington County. In exercising our original jurisdiction under R. 2:10-5, we do so. There is no prejudicial error in the action of the court below.
 The Sixth Amendment to the United
 States Constitution
The Sixth Amendment provides in part that
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law * * *.
Defendants equate "district," as therein provided, to "county." Such argument is not only a semantic distortion of the language of the amendment (which does not mention "county"), but is totally illogical. And so it was rejected in State of Maryland v. Brown, 295 F. Supp. 63, 80 (D. Md. 1969). There the court said:
It is also obvious that the words "district" and "county" were not used synonymously in the three provisions. The word "county" was used in section 29 of the first Judiciary Act. The words "State and district" were used in the Sixth Amendment. A reading of the texts of that constitutional Amendment and of that statute makes it clear that "district" was not meant to connote "county," or vice versa.

Due process of law
Defendants argue that they were denied due process of law when, without a hearing, Judge Kingfield first designated Burlington County as the venue herein. However, after remand from the Supreme Court, Judge Kingfield gave defendants full opportunity to be heard and thereupon *237 settled the venue in Burlington. Therefore defendants suffered no prejudice in the original ex parte proceeding in allocating venue, nor can it be said that due process was denied.

B
 The voir dire examination
 of the jury panel
Defendants contend that the court did not adequately inquire of the jury finally selected as to whether they had been exposed to publicity concerning this case.
Approximately 12 jurors were questioned by the judge before the final jury was selected. Of those, 15 were excused by the court because of exposure to pretrial publicity and that therefore they could not be impartial. Ninety-two others were excused for various reasons or on peremptory challenge.
There is no dispute that there was adequate inquiry made of the initial jury panel. The complaint is that members of the reserve panel were not sufficiently interrogated on this subject. We disagree.
When the reserve panel was brought into the courtroom on the second trial day, the judge told them that the intent of his questioning was to determine whether any reason existed why they could not be impartial. Juror Cline was the first person drawn from the reserve panel. The judge inquired of Cline in the presence of the reserve panel:
Having in mind that we readily admit that none of us live or operate in a vacuum, that we are all exposed to circumstances and media about us, and having in mind also that there may well have appeared in various of the press media certain articles that relate in some fashion to the trial of this case or the personalities involved, is there any experience that you have had with regard to reading, hearing or discussing the merits of this case or expressing our [sic] opinion with respect to the merits of this case?
*238 Later two prospective jurors were excused specifically because of exposure to pretrial publicity.
We find that the trial court adequately inquired of all jurors as to exposure to pretrial publicity.

C

The tapes

(1) Their alleged inaudibility

Defendants contend that the trial court erred in admitting into evidence certain taped conversations between the State's principal witness, Peter Policastro, and others, including defendant Zicarelli.
Policastro had been a member of the West New York Police Department for 18 years and had attained the rank of detective sergeant. After retiring on a disability pension he was engaged in private detective work, but was not successful. He had known defendant Zicarelli for 15 years and, during his police service, had carried messages from Zicarelli to various politicians and police chiefs. Policastro was well familiar with the gambling business in Hudson County. In fact, he had acted as a courier for Zicarelli in carrying "payoffs" to certain public officials.
However, in 1969 Policastro's attitude changed. After meeting with State Police Detective Trainor, he began exchanging information with him and ultimately agreed to become a witness for the State in this case. Policastro suggested that a tape recorder be placed upon his person to tape conversations. After being instructed concerning the use of the equipment he was outfitted with the recorder. There followed several conversations between Policastro and Zicarelli, Michael and John Armellino, Mallamaci and Fluccari. The conversations were taped and transcripts thereof were made with the aid of Policastro, State Trooper Herbert and a stenographer. The tapes were played at the trial and the transcripts were used by the jury as a listening aid.
*239 The only tape, admission of which deserves comment, is that between Policastro and defendant Zicarelli on February 20, 1970, while Zicarelli was confined to St. Mary's Hospital in Hoboken, New Jersey. The main thrust of defendant Zicarelli's argument is that the tape is largely inaudible and unintelligible and therefore should have been excluded, citing State v. Driver, 38 N.J. 255 (1962).
This court listened to that tape and we agree that a substantial part is inaudible. However, the transcript of the tape correctly indicates the portions which were audible and those which were not. Cf. United States v. Hall, 342 F.2d 849 (4 Cir.1965), cert. den. 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965), to the effect that use of a transcript is of assistance to jurors and is within the province of the trial judge's discretion.
It is true that in State v. Driver it was suggested that the tape there involved was so inaudible and garbled that, as a matter of discretion, it should have been excluded.
In reviewing the exercise of discretion here we consider the evidential purpose which the tape served. It has been held that if a tape is partially intelligible and has a probative value, it is admissible even though substantial portions thereof are inaudible. State v. Spica, 389 S.W.2d 35, 48 (Mo. Sup. Ct. 1965), cert. den. 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966); United States v. Hall, supra; Addison v. United States, 317 F.2d 808, 815 (5 Cir.1963), cert. den. 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605 (1964).
Certainly, the tape of the conversation between Policastro and Zicarelli at St. Mary's Hospital on February 20, 1970 proved the intimacy between them and, considered with Policastro's direct testimony, the relationship of that intimacy to the central conspiracy of suppressing prosecution of the gambling enterprise headed by Zicarelli. Therefore, it had probative value to that extent, and was admissible for that purpose. In Driver, on the other hand, the only relevance of the tape was that it was a confession. It had no *240 other probative value. In that case the inaudibility of the tape was central to the purpose for which it was offered and, because it was largely inaudible (in addition to its involuntary nature), it would have been grossly unfair to admit it. As said above, the Policastro-Zicarelli tape had probative value for reasons other than what was said. Inaudibility had no relevance to those reasons. The question of admissibility of the tape was a matter of discretion. Cf. State v. Driver, supra, 38 N.J. at 288. Here there was no abuse of discretion in its admission.
In any event, there was no prejudice to defendants in the introduction of the tapes or the transcript thereof. Policastro testified that everything therein was truly said. He was subjected to cross-examination. See People v. Jackson, 125 Cal. App.2d 776, 271 P.2d 196, 199 (D. Ct. App. 1954). In turn, the tapes served the probative purpose of corroborating Policastro's testimony. The resolution of the weight of that evidence was left to the jury.
We therefore find no error in the admission of the tapes or transcript thereof.

(2) Reference to other crimes
We hold that references in the tapes to other crimes were admissible under the exceptions to Evidence Rule 55.
In State v. Kociolek, 23 N.J. 400 (1957), the court lists a number of exceptions to the general rule that, upon the trial of a person for one crime, evidence that he has committed other crimes is irrelevant. Such exceptions include: (1) when the circumstance of the crime charged and those of the extraneous crime indicate that they were both committed by the same person; (2) when the accused's perpetration of an extraneous crime shows that he had the opportunity of committing the crime in issue; (3) when the several crimes may have sprung from a single motive, aiming at the accomplishment of the same end, and (4) whenever defendant's guilt of an extraneous crime tends to logically prove some particular element of the crime for *241 which he is being tried. See State v. Kociolek, supra, at 419. All of the above instances are fairly applicable to the instant case. See also State v. Mulero, 51 N.J. 224, 228 (1968); State v. Baldwin, 47 N.J. 379 (1966), cert. den. 385 U.S. 980, 87 S.Ct. 527, 17 L.Ed.2d 442 (1966).
Furthermore, it has been held that where a series of crimes is committed for the accomplishment of a single purpose, and that purpose is manifestly the sole cause of the commission of the crime alleged, proof of the separate crimes is competent evidence. State v. Fay, 127 N.J.L. 77, 83 (Sup. Ct. 1941). In Fay it was said:
Where a series of crimes are committed for the accomplishment of a single ultimate purpose, and that purpose is manifestly the sole inducing cause of the commission of each separate crime, the rule applied in the case just cited makes proof of these separate crimes competent evidence. State v. Landecker, 100 N.J.L. 195, 198, 126 A. 408, affirmed, 103 N.J.L. 716, 137 A. 919. [at 83]
Finally, as specifically sanctioned by Evidence Rule 55, evidence of other crimes may be saved from exclusion where it tends, as here, to demonstrate motive, intent, plan, or knowledge.
Therefore, defendant Zicarelli's argument must fail and the evidence is admissible. The "other crimes" here, i.e., corruption of other officials by Zicarelli, were accomplished for a similar purpose  protection of Zicarelli's gambling enterprise. See also State v. Boiardo, 111 N.J. Super. 219 (App. Div. 1970), cert. den. 57 N.J. 130, cert. den. 401 U.S. 948, 91 S.Ct. 931, 28 L.Ed.2d 231 (1971).

D
 Other contentions of defendant
 Zicarelli
Defendant Zicarelli also makes the following contentions:
Point IV. The defendant's motion for judgment of acquittal should have been granted as to the substantive counts.
Point V. The court erred in its charge. * * *

*242 A. The court erred in charging the jury on the substantive counts with respect to an offer of undue reward where such was contrary to the State's theory and there was no evidence concerning same.
B. The court's charge on aiding and abetting was erroneous and confusing.
C. The court erred in its charge on conspiracy.
D. The court erred in refusing to charge that a party vouches for the credibility of its own witnesses.
Point VI. The court erred in permitting testimony that Zicarelli was in custody during part of the time covered by the indictment.
Point VII. The court erred in permitting the State to proceed with its proofs on the basis that Fluccari was a co-conspirator.
Point VIII. The court erred in permitting the State to adduce testimony that Fluccari could not be found.
Point IX. The court erred in permitting Herbert's testimony concerning the structure of a lottery organization and in allowing his chart depicting same to be received in evidence.
Point X. The court erred in sustaining numerous objections made during the summation of Zicarelli's attorney.
We find no merit in any of these contentions.

E

Mallamaci's sentences
Defendant Mallamaci contends that, since he was sentenced to consecutive terms of 20 to 22 months on count I (conspiracy) and counts IX, X, XI and XIII and a similar but concurrent sentence on count XIV (substantive offenses), the sentences were excessive. He contends that, in total, the substantive several offenses constituted "a single course of conduct arising out of the conspiracy to commit those crimes and as a result he should not serve a consecutive sentence on each of those counts."
Not so. As said in State v. Cox, 101 N.J. Super. 470, 475 (App. Div. 1968), cert. den. 53 N.J. 510 (1969):
Here we are unable to agree with defendant's contention that the five offenses of which he was found guilty comprised a single continuous transaction. * * * These represent a sequence of separate events, deliberately undertaken in succession, rather than a single episode.

*243 F

Assessment of costs
The court below erred in assessing the costs of prosecution against defendants Zicarelli and Malamaci. State v. Mulvaney, 61 N.J. 202 (1972). The order to that effect is reversed.

Conclusion
Except as to the assessment of costs as to defendants Zicarelli and Mallamaci, the judgments of conviction are affirmed.
NOTES
[1] Since the contentions of all appellants are encompassed in those raised by appellant Zicarelli (except as to Mallamaci's sentence), disposition of his contentions will be deemed to be dispositive of the contentions of all appellants.