274 N.J. Super. 496 (1994)
644 A.2d 672
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
ROBERT CUSMANO, RICHARD NAJAR AND KEITH PACCIANO, DEFENDANTS-RESPONDENTS, AND SHANNON DICK, DEFENDANT-RESPONDENT/CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted May 10, 1994.
Decided June 30, 1994.
*497 Before Judges PRESSLER, BROCHIN and KLEINER.
Nicholas L. Bissell, Jr., Somerset County Prosecutor, attorney for plaintiff-appellant/cross-respondent (Patrick C. O'Hara, Jr., Assistant Prosecutor, of counsel and on the letter brief).
Robert Musto, attorney for defendant-respondent Robert Cusmano.
Brause & Brause, attorneys for defendant-respondent/cross-appellant Shannon Dick (Pamela Lynn Brause and Peter Ventrice, of counsel and on the letter brief).
Susan L. Reisner, Acting Public Defender, attorney for defendant-respondent Richard Najar (Neill Q. Hamilton, Asst. Deputy Public Defender, of counsel and on the letter brief).
Frank J. Johnson, attorney for defendant-respondent Keith Pacciano.
The opinion of the court was delivered by KLEINER, J.S.C. (temporarily assigned).
Defendants Robert J. Cusmano, Richard K. Najar and Keith M. Pacciano were indicted for second degree aggravated assault, N.J.S.A. 2C:12-1b(1), and third degree possession of a weapon, a *498 pipe, with the purpose to use it unlawfully, N.J.S.A. 2C:39-4d, upon Carmen E. Parisio. This attack occurred March 7, 1993, as Parisio and his girlfriend Lana Jakubiw were exiting Parisio's vehicle in the parking area of an apartment building where Jakubiw rented an apartment with a roommate Maria Kapinos. At the time of the incident Parisio was also residing in that apartment. Kapinos is alleged to have observed the assault from an apartment window.
On June 9, 1993, Jakubiw and Kapinos informed Detective Nicholas Importico of the Somerset County Prosecutor's Office that they had received telephone calls from defendants attempting to persuade them not to testify at the impending trial. Importico obtained authorization for a consensual interception, N.J.S.A. 2A:156A-16, and a recording device was installed at the Jakubiw/Kapinos apartment. Ultimately, ninety minutes of taped conversation were recorded involving either Jakubiw or Kapinos and defendants Cusmano, Pacciano and Shannon Dick. Ms. Dick had been with defendant Pacciano, who was her boyfriend, on March 7, 1993.
As a result of these tape recordings, another indictment was returned by the Somerset County Grand Jury charging in: Count one, aggravated assault, N.J.S.A. 2C:12-1b(1), by defendants Cusmano, Najar and Pacciano and in Count two, conspiracy of those three defendants and Shannon Dick to induce Jakubiw or Kapinos to testify falsely or withhold testimony in violation of N.J.S.A. 2C:5-2 and N.J.S.A. 2C:28-5a; Counts three, four and five separately charged defendants Cusmano, Pacciano and Dick individually with substantive violations of N.J.S.A. 2C:28-5a.
On September 20, 1993, defendant Dick filed a motion to dismiss the indictment and a separate motion seeking a hearing as to the admissibility of the tape recordings. The motion to dismiss was denied on October 21, 1993 by the Presiding Judge of the Criminal Part.
An Evid. R. 8 hearing (now N.J.R.E. 104) was conducted by another judge on November 29 and 30, 1993 and December 1, *499 1993. Prior to that hearing defendants Cusmano and Pacciano also filed formal motions to challenge the admissibility of the taped conversations. Defendant Najar was granted leave to participate in that evidentiary proceeding.[1]
At the conclusion of this hearing, the court rendered an oral opinion suppressing the taped recordings, and thereafter filed a written opinion on December 9, 1993 supplementing the oral decision. The proposed recorded evidence consists of three sides of taped conversations, marked and designated "tape one, side one," "tape one, side two," and "tape two, side one." Each side comprises thirty minutes. The motion judge considered the tapes as one unit and ruled the tapes inadmissible at trial on a dual basis: the operators of the recording equipment were not competent and the tapes as offered contain deletions. The court's conclusions are interrelated: the presence of the deletions were regarded by it as evidence of the incompetence of the operators of the recording equipment or, postulated differently, the incompetence of the operators caused the occurrence of the deletions. The court predicated its decision on State v. Driver, 38 N.J. 255, 183 A.2d 655 (1962). As discussed infra, Driver does not define the operator's "competence." The motion judge declared "competence" should be construed as "`competence to operate a sound recording device for use in a criminal prosecution.'" The judge did not further explain his definition. We conclude that an analysis of judicial precedent in the federal courts leads to the contrary conclusion that the tapes are admissible. We agree with the federal analysis and are constrained to reverse.
On December 17, 1993, the State sought leave to appeal the interlocutory decision of the motion judge and thereafter defendant Dick filed a cross-motion seeking leave to appeal the denial of her motion to dismiss the second indictment. Both motions for *500 leave to appeal were granted and these separate appeals have been consolidated for disposition.
Since the motion judge premised his decision on State v. Driver, id., we will, in Part I, review New Jersey precedent commencing with Driver as background for our analysis, in Part II, of the proffered tape recorded conversations. In Part III, we will discuss federal precedent upon which we primarily rely in reaching our decision. Part IV will focus upon the separate appeal by defendant Dick.

I
In State v. Driver, supra, 38 N.J. at 287, 183 A.2d 655, the Supreme Court stated:
At the present time the great weight of authority throughout the country sanctions the use of sound recordings where the matter contained therein is competent and relevant. See Annotation, 58 A.L.R.2d 1024 (1958). We adopt that view. As a condition to admissibility, however, the speakers should be identified and it should be shown that (1) the device was capable of taking the conversation or statement, (2) its operator was competent, (3) the recording is authentic and correct, (4) no changes, additions or deletions have been made, and (5) in instances of alleged confessions, that the statements were elicited voluntarily and without any inducement. Annotation, supra, at pp. 1027, 1032-36; as to confessions, see the many cases cited at pp. 1046-47.
In Driver, the court determined that a tape recording of a confession should have been excluded. The specific reasoning of the court was:
In the matter now before us, therefore, the tape recording was not inadmissible per se, so long as its capacity to record accurately, and the other conditions precedent were established. But even if the involuntary character of the recording did not bar it, in our view it should have been excluded. It was garbled, full of static and other foreign sounds; it was unintelligible and inaudible for the most part, and a fair exercise of discretion required the entire tape to be withheld from the jury. In this connection, we note the comment of the trial judge as he listened to it: "If you can't hear it, you can't hear it. Inaudible." He did not specify further. Basic fairness demanded its exclusion.
[Id. at 288, 183 A.2d 655 (citations omitted).]
Since 1962, the Annotation, 58 A.L.R.2d 1024, relied upon by the Court in Driver has been supplemented. See 57 A.L.R.3d 746 (1974). Our review of the cited decisions throughout the United *501 States in both State and federal courts reflect that the broad conclusion pronounced in State v. Driver, supra, is still correct.
Although State v. Driver, id., is often cited for various precedential value, our research reveals only five New Jersey decisions which specifically rely upon State v. Driver in examining the admissibility of particular recordings: State v. Seefeldt, 51 N.J. 472, 487, 242 A.2d 322 (1968); State v. Seaman, 114 N.J. Super. 19, 28, 274 A.2d 810 (App.Div.), certif. denied, 58 N.J. 594, 279 A.2d 679 (1971), cert. denied, 404 U.S. 1015, 92 S.Ct. 674, 30 L.Ed.2d 662 (1972); Sarte v. Pidoto, 129 N.J. Super. 405, 324 A.2d 48 (App.Div. 1974); State v. Zicarelli, 122 N.J. Super. 225, 239-40, 300 A.2d 154 (App.Div.), certif. denied, 63 N.J. 252, 306 A.2d 455, cert. denied, 414 U.S. 875, 94 S.Ct. 71, 38 L.Ed.2d 120 (1973); State v. Gora, 148 N.J. Super. 582, 593, 372 A.2d 1335 (App.Div.), certif. denied, 74 N.J. 275, 377 A.2d 679 (1977).
Relevant to our discussion, although not citing Driver, is State v. Dye, 60 N.J. 518, 291 A.2d 825, cert. denied, 409 U.S. 1090, 93 S.Ct. 699, 34 L.Ed.2d 675 (1972), modified on other grounds by State v. Catania, 85 N.J. 418, 427 A.2d 537 (1981), involving in part the admissibility of conversations recorded over tapped telephones pursuant to N.J.S.A. 2A:156A-1 et seq., the New Jersey Wiretapping and Electronic Surveillance Act.
Of the five cases specifically relying on Driver, only State v. Zicarelli, supra, is particularly relevant to our analysis sub judice. The Zicarelli court noted:
It is true that in State v. Driver it was suggested that the tape there involved was so inaudible and garbled that, as a matter of discretion, it should have been excluded.
In reviewing the exercise of discretion here we consider the evidential purpose which the tape served. It has been held that if a tape is partially intelligible and has a probative value, it is admissible even though substantial portions thereof are inaudible. State v. Spica, 389 S.W.2d 35, 48 (Mo.Sup.Ct. 1965), cert. den. 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966); United States v. Hall, [342 F.2d 849 (4 Cir.1965)] supra; Addison v. United States, 317 F.2d 808, 815 (5 Cir.1963), cert. den. 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605 (1964).
Certainly, the tape of the conversation between Policastro and Zicarelli at St. Mary's Hospital on February 20, 1970 proved the intimacy between them and, considered with Policastro's direct testimony, the relationship of that intimacy to *502 the central conspiracy of suppressing prosecution of the gambling enterprise headed by Zicarelli. Therefore, it had probative value to that extent, and was admissible for that purpose. In Driver, on the other hand, the only relevance of the tape was that it was a confession. It had no other probative value. In that case the inaudibility of the tape was central to the purpose for which it was offered and, because it was largely inaudible (in addition to its involuntary nature), it would have been grossly unfair to admit it. As said above, the Policastro-Zicarelli tape had probative value for reasons other than what was said. Inaudibility had no relevance to those reasons. The question of admissibility of the tape was a matter of discretion. Cf. State v. Driver, supra, 38 N.J. at 288 [183 A.2d 655]. Here there was no abuse of discretion in its admission.
In any event, there was no prejudice to defendants in the introduction of the tapes or the transcript thereof. Policastro testified that everything therein was truly said. He was subjected to cross-examination. See People v. Jackson, 125 Cal. App.2d 776, 271 P.2d 196, 199 (D.Ct App. 1954). In turn, the tapes served the probative purpose of corroborating Policastro's testimony. The resolution of the weight of that evidence was left to the jury.
[122 N.J. Super. at 239-40, 300 A.2d 154.]
Although State v. Dye, supra, does not rely upon Driver, the issue posed is essentially the same, whether tapes of a tapped telephone call should be admitted into evidence. The Supreme Court summarized the problem:
Moreover, there is no support in the record for the contention that all the tapes should be excluded either because they were entirely inaudible or inaudible in such substantial part as to render them untrustworthy. Unless such a condition appeared the State was entitled to have the tapes admitted in evidence. See United States v. Knohl, 379 F.2d 427, 440 (2 Cir.), cert. den. 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); Addison v. United States, 317 F.2d 808, 815 (5 Cir.1963), cert. den. 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605, reh. den. 376 U.S. 966, 84 S.Ct. 1121, 11 L.Ed.2d 984 (1964); Todisco v. United States, 298 F.2d 208 (9 Cir.1961), cert. den. 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527 (1962); Cape v. United States, 283 F.2d 430, 435 (9 Cir.1960); and Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49, 55, cert. den. 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956), where it was said "that partial inaudibility is no more valid reason for excluding recorded conversations than the failure of a personal witness to overhear all of a conversation should exclude his testimony as to those parts he did hear. Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the trial judge."
[State v. Dye, supra, 60 N.J. at 531, 291 A.2d 825 (citations omitted) (emphasis added).]
The other four cases which rely upon Driver (Seefeldt, Seaman, Pidoto and Gora) each involved audibility issues and in each instance a tape recording was admitted into evidence.
*503 In the case sub judice, defendants did not challenge the tape recording due to audibility problems. As we will note infra, the tape recording is perfectly audible. Defendants' arguments rest upon their contention that the tape recording machine operators were incompetent, Driver, supra, 38 N.J. at 287, 183 A.2d 655 (factor two), and that "changes, additions or deletions" have been made in the tapes, ibid. (factor four), thus rendering the tape recordings inadmissible.

II
As part of the Driver hearing, the court had the benefit of listening to a copy of the original tapes of five distinct telephone conversations intercepted on June 10, 1993, and was assisted by a transcript of those interceptions which by stipulation were deemed accurate. This transcript comprises sixty-four pages numbered one to sixty-four. As noted supra, when played, the entire conversations were timed as lasting ninety minutes. The transcript bears the designations "tape one, side one," "tape one, side two," and "tape two, side one."
Tape one, side one contains the start of two distinct telephone calls received at the interception location. The first telephone call was received by Jakubiw from a male later identified as defendant Keith Pacciano. That conversation is recorded in its entirety, without audibility difficulty and without interruption. It commences on page one of the transcript and terminates at the bottom of page three, when Pacciano hands the telephone to Shannon Dick.[2] Dick and Jakubiw are heard conversing without interruption for the remainder of page three to the middle of page seven, where the tape recording suddenly ends. The transcript on page seven at that point bears the words "(tape cuts out)."
*504 Defendants presented an expert witness, Paul Ginsberg.[3] On direct examination, Ginsberg testified as follows:
Q Okay. Now, I am going to call your attention to the first conversation, and that is 
A Yes.
Q  from pages 1 through page 7?
A Yes.
Q Did you notice anything significant about that conversation?
A Yes, I did.
Q Okay. Can you tell us what you noticed?
A At the conclusion of the recording  let's put it this way. There was no conclusion of recording. On page 7 in the middle of the page there is a notation by the transcriber in parenthesis "tape cuts out". In fact, the tape did not cut out but what I found from my examination was that the recorder after the conclusion of the conversation being recorded was at some subsequent time rewound back to a certain point and restarted recording another conversation, thus obscuring the balance of the original conversation that was being overrecorded by this new conversation.
And this is clearly evident from observation on the oscilloscope as well as contextually by anybody just reading on or listening to the tape. There is a tape, conversation in progress on page 7, and at a certain point there is a new conversation that starts in which is unrelated to the original conversation.
Ginsberg also indicated that it is impossible to determine how long the conversation between Shannon Dick and Lana Jakubiw lasted after the next conversation began. He did indicate, however, that the recorded conversation between defendant Dick and Jakubiw lasted five minutes.[4]
The balance of page seven is a transcription of a separate and distinct conversation between defendant Robert Cusmano and Maria Kapinos. That conversation continues without interruption until the top of page twenty-two, when Kapinos transfers the telephone to Lana Jakubiw. Jakubiw and Cusmano continue their *505 conversation to the bottom of page fifty-three of this transcript. The transcript reflects three interruptions of this conversation as follows:
Page 24 "(End of side 1 of tape # 1.)"
Page 43 "(End of side 2 of tape # 1.)"
Page 53 "(Tape cuts out.)"
Ginsberg offered the following pertinent testimony on direct examination:
Q Okay. Now, you initially noted your subsequent notation is that the tape is turned over and there is a lost part of the conversation. I am going to call your attention to that on page 24.
A Yes.
Q Okay. Now, I know if you do that the transcript indicates end of side one, tape 1. Do you reach that determination that the tape is turned over independent of the notations from the transcript?
A Yes. It was observed that there was a discontinuity in the conversation and it happened at the point at the end of side 1 and the beginning of side 2 and so there was a certain amount of conversation that was omitted at that point during that period of time.
Q And I presume it goes without saying that you can't ascertain how long the conversation was?
A No, no way.
Q Similarly you make an observation on page 43 about a tape turnover?
A Yes. This was actually the end of side 2 of the first type tape and the beginning of side 1 of the second tape, and exactly the same conditions apply.
It would appear that the discontinuity in those two instances is attributable to a mechanical defect in the recording process. This is distinguished from a discontinuity attributable to "overrecording" which the witness defined as "somebody recorded over another conversation." The witness clearly indicated that the discontinuity, designated as "tape cuts out" on page fifty-three, lasted ten seconds. However, he also indicated that this ten second discontinuity was not a result of overrecording. These explanations are a part of Ginsberg's cross-examination where he indicated:
Q Well, how long was the tape? How long was the side of the tape?
A I believe the tapes that I received were 60, so there is 30 minutes on each side.
Q So if I understand right in the left hand column you have a running time, is that correct?

*506 A Yes.
Q So from the point at 8:42 into the playing of the first side of the first tape until the end of that side you noted no problems in the conversation that was recorded, is that correct?
A That's correct.
Q Then you have tape turnover, loss of part of conversation, true?
A Yes.
Q When the tape is turned over you naturally lose part of the conversation, would you find that in your expertise?
A Yes.
Q Okay. Now, we have side 2 of the tape, and do you know how long side 2 of the tape the recordings went on for?
A Well, it would be the same amount of time, I believe.
Q So 30 minutes?
A I believe so.
Q And during that 30 minute 
A Well 
Q Excuse me?
A I am not  I believe so.
Q And during that 30 minute conversation on side 2 of tape 1, you didn't find any problems with overrecordings or such, is that correct?
A No. None noted.
The telephone conversation with defendant Cusmano lasts fifty-three minutes. There is a natural or expected interruption on page twenty-four of the transcript and again on page forty-three when the tape is switched from tape one to tape two. There is a ten second gap on page fifty-three immediately before the conversation is completed.
The testimony at the Evid.R. 8 hearing then focused on what purports to be a third telephone call.[5] The male caller is identified as defendant Pacciano and the call was received by Kapinos. The conversation commences on page fifty-four of the transcript bearing the designation "Call # 3 3:59."
There are two interruptions on page fifty-five of the transcript. Ginsberg opined that these interruptions lasted three seconds and *507 thirty-one seconds. This conversation continues without interruption until page sixty, where the following appears:
KP: I don't know, where's Lana now?
MK: She is in her room, hold on I will get her.
KP: Alright.
MK: Lan (yelling for Lana to come to phone), Lana.
KP: (Inaudible) (talking to someone in the background)
MK: Lan ...
KP: Anything you said already up until tomorrow does not matter.
LJ: Um-hum.
KP: You have to go tomorrow, you can go there with Maria. Where do you have to go, to the police station.
(tape cuts out)
Our review allows us to conclude that the fifth telephone conversation between defendant Pacciano and Kapinos is a complete conversation which ended when Kapinos handed the telephone to Jakubiw. The interruption on page sixty actually occurred at the start of a new sixth conversation during the third telephone call, i.e., between defendant Pacciano and Jakubiw. The expert witness offered no opinion as to the time lapse between the last words "police station," which were spoken by Kapinos, and the next recorded words. Ginsberg also offered no testimony regarding the succeeding recordation.
The following five line conversation appears on pages sixty and sixty-one of the transcript. It is the commencement of a fourth telephone call and the seventh recorded conversation.
MK: Hello.
NI: Hi, who's this, Maria?
MK: Yeah, who is this?
NI: Yeah, this is Nick Importico.
MK: Oh hold on a minute.
The very next line of the transcript on page sixty-one commences the fifth and last telephone call and the eighth recorded conversation between Pacciano and Kapinos:
MK: Hello.
KP: Is Lana there?

*508 MK: Who is calling?
KP: It is Keith.
MK: Hi Keith.
KP: Hi Maria.
MK: What's up?
KP: Nothing.
MK: Alright hold on.
LJ: Hello.
KP: Hellooo.
LJ: Hi.
The telephone is then transferred to Jakubiw and the conversation between Jakubiw and Pacciano (the ninth conversation) continues until the tape ends on page sixty-four.
On pages sixty-two and sixty-three there are six instances where the word "inaudible" appears in the transcript. That word appears next to the initials "SD," although there are also sounds attributable by the transcriber to "SD." We infer that testimony' might be offered to demonstrate that Shannon Dick was standing near defendant Pacciano during his conversation with Jakubiw and that her voice is identifiable on the tape although her actual words are inaudible.
Attached to the transcript is a handwritten document bearing the caption "Phone Log," which reads:

 Time Date From
 1:48 6/10/93 Keith & Shannon
 2:24 6/10/93 Rob
 3:59 6/10/93 Keith
 4:37 6/10/93 Keith

Prior to the recordation of these telephone calls, Detective Importico instructed Jakubiw and Kapinos on operating the recording equipment. Detective Importico testified as to his instructions to Jakubiw and Kapinos:
Q Okay. And did you tell them to pick up the conversation from starting of if the phone rang to the end of the conversation? Do you know what you told them about that?
A Yeah, to start the tape recorder if the phone rings. If it's someone that's not mentioned in our consensual interception, turn it off such as when I called.

*509 Q Okay. But if it's somebody that is mentioned in the consensual, then they should tape?
A Leave it on. Yes.
....
Q Let's say somebody unrelated calls, person A calls, and that has nothing to do with the case, and they are on the tape. Did you instruct them whether or not they should shut the machine off and then the next time the phone rang to begin recording at that point, or whether they should go back to the beginning and rerecord over the initial conversation?
A No. I told them not to back up on it. Just continue the tape record.
Jakubiw testified that she could not recall any of the instructions she received. When asked about the recorded conversation with defendant Dick, Jakubiw testified:
Q When the tape stopped while you were talking to Shannon, what happened?
A I stopped it.
Q Why did you stop it?
A Because I didn't think that she was supposed to be taped.
Q And who told you that she wasn't supposed to be taped?
A Nobody told me, but she didn't have anything to do with the case, so I didn't think she was supposed to be taped.
It is clear that although Jakubiw did not recall the instructions given to her by Importico, her actions were partially consistent with those instructions. She recorded the entire short conversation with Pacciano and terminated the recordation of the conversation with Dick who was not then a defendant. Ginsberg opined that the remainder of the conversation with Dick was overrecorded. Jakubiw testified that she had stopped the machine.

III
Prior to State v. Driver, supra, the primary cited precedent establishing the standard for the admissibility of a sound recording is U.S. v. McKeever, 169 F. Supp. 426, 430 (S.D.N.Y. 1958), rev'd on other grounds, 271 F.2d 669 (2d Cir.1959), setting forth the following criteria:
(1) That the recording device was capable of taking the conversation now offered in evidence.
(2) That the operator of the device was competent to operate the device.
(3) That the recording is authentic and correct.

*510 (4) That changes, additions or deletions have not been made in the recording.
(5) That the recording has been preserved in a manner that is shown to the court.
(6) That the speakers are identified.
(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.
The McKeever court did not define the competency requirement. In Slatinsky v. Bailey, 330 F.2d 136, 140-41 (8th Cir.1964), and United States v. McMillan, 508 F.2d 101, 104 (8th Cir.1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), the Eighth Circuit approved the McKeever test.
The Fifth Circuit has rejected this strict formulation, however, and instead requires only a showing of "competency of the operator, the fidelity of the recording equipment, the absence of material deletions, additions, or alterations in the relevant portions of the recording, and the identification of the relevant speakers." United States v. Anderton, 679 F.2d 1199, 1202 (5th Cir.1982) (quoting United States v. Biggins, 551 F.2d 64, 66 (5th Cir.1977)).
The New Jersey Supreme Court in State v. Driver, supra, 38 N.J. at 287, 183 A.2d 655, did not cite to any particular federal case law, but did set out five of the seven McKeever criteria. Like McKeever, supra, Driver also did not define "competency."
Federal case law indicates that the courts are liberal as to the issues of competency of the operator and capability of the recording device. In United States v. McMillan, supra, 508 F.2d at 104, the Eighth Circuit concluded that the operator's testimony as to how he learned to use the recording device, coupled with the operator's ability to make the recording successfully, satisfied the competency requirement. See also United States v. McCowan, 706 F.2d 863, 865 (8th Cir.1983) (the very fact that the operator successfully made the tape recordings satisfies competency requirement).
In United States v. Risken, 788 F.2d 1361 (8th Cir.), cert. denied, 479 U.S. 923, 107 S.Ct. 329, 93 L.Ed.2d 302 (1986), Greenfield, an informant for the FBI, made several recordings of his conversations with the defendant "using a friend's tape recorder *511 and without FBI assistance." Id. at 1369-70. Additionally, one of the recordings had at least eight gaps. Id. at 1370. However, the Eighth Circuit did not consider the presence of these gaps in its assessment of Greenfield's competency to operate the recording equipment. Citing McCowan, supra, the court in Risken found the question of Greenfield's competency had been satisfied by virtue of his testimony that he had learned to operate the recording device as well as the existence of a successful recording. 788 F.2d at 1370.
The court in United States v. Franklin, 747 F.2d 497 (8th Cir.1984), affirmed the admission of tape recordings of phone conversations between the defendant and an informant. Defendant contended there was no evidence as to the competency of the operator and the capability of the device. "The operator testified that he was competent to operate the recorder and that he had been using the recorder for five years. Furthermore, `[t]he very fact that the tape recordings exist establishes that the recording device was capable of picking up sounds and taking the conversation offered.'" Id. at 498 (quoting U.S. v. McCowan, supra, 706 F.2d at 865). `[T]he fact that [the operator] successfully made the tape recordings [] satisfies the competency requirement....'" Ibid.
In United States v. Biggins, supra, 551 F.2d 64, an original tape recording and a rerecording of a conversation between defendant and a government informant was deemed properly admitted into evidence even though the agent who operated the electronic monitoring equipment was not shown to be trained in the use of the equipment and there was no verification that the original recording was a faithful rendition of the conversation that took place. The agent evinced some familiarity with techniques of electronic surveillance, and government testimony that the conversation corresponded closely to the recording was sufficient to permit admissibility of the recorded conversation.
In U.S. v. Hughes, 658 F.2d 317 (5th Cir.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), the court stated:

*512 While there are no formalistic standards governing the admissibility of tapes, U.S. v. Greenfield, 574 F.2d 305 (5th Cir.), cert. denied, 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978), as a general rule the government is required to prove the competency of the operator, the fidelity of the recording equipment, the absence of material alterations in the relevant portions of the recording, and the identity of the speakers. United States v. Biggins, 551 F.2d 64 (5th Cir.1977). The trial court, however, has broad discretion in determining the admissibility of such evidence and, while strict compliance with the government's particularized burden is the preferred method, the paramount purpose of the inquiry is to insure the accuracy of the recording. United States v. Gorel, 622 F.2d 100 (5th Cir.1979) cert. denied, 445 U.S. 943, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980).... Here, as in Biggins, the government's failure to show the competency of either the operator or the machine was overshadowed by evidence which demonstrated the reliability of the tapes.
[Citations omitted.]
Based upon the precedent in the federal courts, we conclude that the motion judge misinterpreted Driver and improperly declared the tapes inadmissible. A determination of operator competence must be viewed liberally. We do not consider the demeanor of the operators at the Evid.R. 8 hearing, cited by the motion judge, as relevant to the issue of their individual competence to operate a tape recorder on June 10, 1993. The tapes as produced include ninety minutes of recorded conversations, including three gaps lasting a total of forty-four seconds. Additionally, two gaps were caused mechanically when the tape sides were changed and are not, therefore, attributable to or a measure of operator competency. We recognize that the recordation of the conversation with Shannon Dick is abbreviated, yet five minutes of that conversation is recorded without a gap and is perfectly audible. As noted supra, "partial inaudibility is no more valid reason for excluding recorded conversations than the failure of a personal witness to overhear all of a conversation should exclude his testimony as to those parts he did hear." State v. Dye, supra, 60 N.J. at 531, 291 A.2d 825.
Had the remainder of the conversation between Jakubiw and Dick been merely disrupted by other noise rendering it inaudible, the initial perfectly recorded five minutes of conversation would still have been admissible. The exclusion of the tape in Driver, supra, 38 N.J. at 288, 183 A.2d 655, resulted from the continuous *513 audibility problem which rendered the entire tape incomprehensible. The five minutes of recorded conversation here is clearly audible, is perfectly recorded, and is far from being incomprehensible.
We cannot accept the trial court's determination that a ten second gap at the very end of fifty-eight minutes of taped conversation between Cusmano, Kapinos and Jakubiw should render the entire tape inadmissible. Kapinos and Jakubiw may not have approached their responsibilities seriously or they may have performed their task haphazardly, both characteristics determined by the motion judge, and the predicate upon which he deemed each not competent, but they did produce substantially audible tape recordings of the telephone conversations with insignificant omissions.[6]
The trial court also premised its decision on the fourth Driver requirement that "no changes, additions, or deletions have been made." Id. at 287, 183 A.2d 655. It was uncontradicted at the Evid.R. 8 hearing that the tapes sought to be utilized at trial had not been spliced, thus eliminating any consideration of "change" or "additions" to the tapes. The word "deletions" can imply the elimination from a tape of material which has been recorded, either by splicing, rerecording, or erasure. "Deletions" might also connote "omission in recording" resulting from the purposeful or accidental termination of the recording.
As noted supra, Jakubiw indicated that the omission of the remainder of the conversation between herself and Dick was purposeful. However, the defense expert, Ginsberg, testified:
There was no conclusion of recording. On page 7 in the middle of the page there is a notation by the transcriber in parenthesis "tape cuts out". In fact, the tape did not cut out but what I found from my examination was that the recorder after the conclusion of the conversation being recorded was at some subsequent time *514 rewound back to a certain point and restarted recording another conversation, thus obscuring the balance of the original conversation that was being overrecorded by this new conversation.
And this is clearly evident from observation on the oscilloscope as well as contextually by anybody just reading on or listening to the tape. There is a tape, conversation in progress on page 7, and at a certain point there is a new conversation that starts in which is unrelated to the original conversation.
The trial court concluded for reasons discussed infra that the testimony of Ginsberg was credible and that Jakubiw was incredible, and suppressed the use of the entire ninety minutes of tape recording. As noted in State v. Zicarelli, supra, 122 N.J. Super. at 531, 300 A.2d 154, the omission of only a portion of a conversation is not a basis to exclude the appropriate use of any portion of the conversation which has otherwise been properly recorded.
The second telephone call involves defendant Cusmano. As noted, this call is perfectly recorded and the transcript does not include any reference to audibility difficulties. In the fifty-eight minutes of recorded material, there are three interruptions: (a) on page twenty-four of the transcript where "tape one, side one" is turned over to begin "tape one, side two"; (b) a discontinuity on page forty-three when the tape was changed at the end of "tape one, side two"; and (c) a gap of ten seconds on the last page of that particular conversation.
In United States v. Nicholl, 664 F.2d 1308 (5th Cir.), cert. denied, 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir.1984), the record in question included a one minute gap which occurred when the tape reached the end of one side and was turned over. Id. at 1314. In deciding whether such an omission rendered the recording so untrustworthy so as to be inadmissible, the Fifth Circuit looked to United States v. Greenfield, 574 F.2d 305 (5th Cir.), cert. denied, 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978). The Greenfield court had held that tapes that included portions which were inaudible were admissible, so long as the inaudible portions were not "`so substantial as to *515 render the recording as a whole untrustworthy.'" Id. at 307 (quoting United States v. Avila, 443 F.2d 792, 795 (5th Cir.), cert. denied, 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258 (1971)). Although the Greenfield holding addressed inaudible portions of recordings, the Nicholl court extended the Greenfield rationale to omissions in recordings, and found that the one minute gap "hardly rendered the tape as a whole untrustworthy." Nicholl, supra, 664 F.2d at 1314.
The gaps on pages twenty-four and forty-three are analogous to other gaps in tapes which have not resulted in suppression. In U.S. v. Lively, 803 F.2d 1124 (11th Cir.1986), a witness was wearing a receiving and recording device in the presence of defendant. When the witness approached the defendant, a DEA agent activated the recorder and receiver. The witness, unaware of this, inadvertently turned off the receiver when the conversation began. After discovering his error, he reactivated it, but approximately seven seconds of conversation were not recorded. The court concluded that the resultant gap in the recording was not so substantial so as to render the entire tape untrustworthy, and that the trial court did not abuse its discretion in admitting the tape. Id. at 1129.
Kapinos explained the ten second gap on page fifty-four of the transcript near the end of the Cusmano conversation as a result of mechanical defect. She indicated that either the suction cup on the telephone fell off or the prong connecting the recorder to the telephone became unfastened. Expert Ginsberg attributed this gap to rerecording. Since the Cusmano conversation lasted fifty-eight minutes, we can hardly conclude that a ten second gap, for whatever reason, other than purposeful splicing or purposeful rerecordings designed to destroy exculpatory conversation, should have resulted in the conclusion reached by of the trial court to disallow the use of the entire ninety minutes of tape at trial.
The third telephone call involved Kapinos and Pacciano and includes two gaps which last four seconds and thirty-one seconds and appear on page fifty-five of the transcript. This conversation *516 also abruptly stops on page sixty. Kapinos again attributed the gaps to mechanical difficulty and attributed the abrupt termination to the fact that the recorder fell off a shelf and dislodged the tape. However, Ginsberg attributed both gaps to rerecording. We question that opinion. As we understand the testimony, a rerecording, as that term was used by the expert, implies a recording of a new conversation over the taped portion of a prior recorded conversation and would be identifiable by the commencement of a new conversation between two speakers and the resulting discontinuance of a conversation between the previous two speakers. However, here, the gaps on pages fifty-five and sixty of the transcript abruptly stop during a continuance of the conversation between Pacciano and Kapinos and resume after each gap with a conversation between Pacciano and Kapinos. The resumed conversation does not contain words implying that the recorded material constitutes the start of an entirely new conversation between the same participants. The resumed taping indicates that the conversation is an ongoing dialogue. We conclude that Ginsberg's opinion that these gaps are attributable to rerecording is without basis. The more logical explanation for these gaps is the one offered by Kapinos, that for four seconds and for thirty-one seconds either the suction device fell off the receiver of the plug connecting the tape recorder or the telephone became dislodged. Those gaps should not have rendered the evidence inadmissible, United States v. Nicholl, supra, 664 F.2d at 1314; United States v. Greenfield, supra, 574 F.2d at 307; United States v. Lively, supra, 803 F.2d at 1129.
The fourth telephone call, as discussed, consisted of five lines of a conversation between Kapinos and Importico. The existence of this conversation on the tape was explained by Importico as an example where a call was received, taping began, and the taping was immediately stopped by Kapinos as it did not involve a defendant. Although the court may have utilized the inclusion of this conversation as demonstrating improper or incompetent taping, arguably, it is equally illustrative of Kapinos' competence to follow directions given initially by Importico.
*517 The fifth conversation also involved defendant Pacciano. Although that conversation contains no gaps or interruptions, it does contain several instances of inaudibility. Defense counsel did not urge inaudibility as a basis to exclude the tapes from evidence, nor did the court focus on inaudibility in its oral or written opinion.
Ordinarily, "[t]he findings of the trial judge will not be disturbed on appeal `if they could reasonably have been reached on sufficient credible evidence in the record....'" Biunno, Current N.J. Rules of Evidence, comment 6 on Evid.R. 8(3) (now N.J.R.E. 104(c)) (1993) (citing State v. Godfrey, 131 N.J. Super. 168, 329 A.2d 75 (App.Div. 1978), aff'd o.b., 67 N.J. 267, 337 A.2d 371 (1975)); Cf. Driver, supra, 38 N.J. at 288, 183 A.2d 655 (decision to exclude tape was a "fair exercise of discretion"). However, if in exercising discretion, a "trial judge misconceives the applicable law or misapplies it to the factual complex, ... it is the duty of the reviewing court to adjudicate the controversy in light of the applicable law in order that a manifest denial of justice be avoided." State v. Steele, 92 N.J. Super. 498, 507, 224 A.2d 132 (App.Div. 1966).
We conclude that the operators Kapinos and Jakubiw were competent to operate the tape recorder utilized during this surveillance. Their work product, although not perfect, is an audible recordation of substantially all pertinent conversations received on June 10, 1991. Each pertinent conversation should be admitted into evidence as corroborative proof of the criminal conduct alleged as to each defendant, and the tapes as a unit are admissible as corroborative proof of the alleged conspiracy. The trial court's decision to exclude all of the taped material due to minor recording gaps or the deletion of a portion of the conversation with defendant Dick in our opinion was a mistaken exercise of discretion. That decision is accordingly reversed.

IV
Defendant Shannon Dick filed a motion to dismiss Indictment 93-06-0222-I, which was denied on October 8, 1993. The motion judge in his decision stated:

*518 Essentially, what the defendant contends is that it was unclear in the Grand Jury transcript precisely what acts and conversations were attributable to each defendant and that the testimony did not clearly connect Shannon Dick with the crimes. The problem is that the Prosecutor's detective, who testified before the Grand Jury, was asked leading questions which did not specifically refer to each defendant but generally referred to them as "the defendants" or "they".
Thus, the detective did not specifically establish what was said or done by each individual defendant and it is unclear to what extent each defendant participated in the crimes. Indeed, after all of the testimony had been received one of the jurors was not even certain who Shannon Dick was.
"[J]udicial power to dismiss an indictment is not to be exercised except on the clearest and plainest grounds and ... an indictment should stand unless manifestly deficient or palpably defective." State v. Ramseur, 106 N.J. 123, 232, 524 A.2d 188 (1987) (citing State v. Wein, 80 N.J. 491, 501, 404 A.2d 302 (1979); State v. Weleck, 10 N.J. 355, 364, 91 A.2d 751 (1952)).
The motion judge was of the opinion that the evidence presented to the Grand Jury was sufficient to sustain the indictment. State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 27, 472 A.2d 1050 (1984). However, the judge also concluded that defendant Dick is "entitled to a more specific statement of her involvement in the alleged crimes." The court allowed the State the opportunity to provide defendant with an affidavit of the only witness who testified before the Grand Jury outlining the State's theory of the indictment as it pertained to this defendant. The court further ordered that defendant would be permitted to refile her motion to dismiss after receipt of this affidavit.
An affidavit was in fact presented to the court and to defendant Dick. Dick immediately renewed her motion to dismiss the indictment, and the motion judge again denied that motion on November 15, 1993.
We have concluded that the tape of the conversation between defendant Dick and the witness Jakubiw will be admissible at trial. That conversation and Dick's apparent presence with Pacciano during his second conversation with Jakubiw is sufficient evidence to support the indictment. The order denying the motion to dismiss the indictment against Shannon Dick is affirmed.
NOTES
[1] Defendant Najar has filed a brief in this appeal although he did not file a motion seeking to bar the admissibility of evidence before the trial court.
[2] On June 10, 1993, the date these recordings were made, Shannon Dick was not a named defendant in any criminal complaint.
[3] The Prosecutor stipulated to Ginsberg's qualifications and the court accepted Ginsberg as a qualified expert. The nature of his expertise and his qualifications do not appear in the transcript or the record on appeal.
[4] Ginsberg's conclusion inexplicably indicates that someone rewound the tape erasing a portion of the conversation between Dick and Jakubiw rather than erasing the entire conversation.
[5] The third telephone call is actually the fifth conversation recorded that day.
[6] Ginsberg opined that other telephone calls were received which were not recorded at all or were completely erased. The omissions were of non-pertinent calls. At best, the omission should affect the weight to be given to the evidence and not its admissibility.